WESTERN NATIONAL BANK OF CASPER, Appellant (Defendant below),

Larry Darlington (Defendant below),

v.

James HARRISON, Appellee (Plaintiff below).

No. 4781.

Supreme Court of Wyoming.

April 14, 1978.

Mayne W. Miller, Miller & Miller, Casper, signed the brief and appeared in oral argument on behalf of the appellant.

H. B. Harden, Jr., Harden & Harden, Casper, signed the brief and appeared in oral argument on behalf of the appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

By this appeal, defendant-appellant challenges a judgment of the district court for Natrona County, Wyoming, awarding plaintiff-appellee damages for the improper disposition of collateral following plaintiff-ap-

pellee's default on a loan. In urging reversal, defendant-bank asserts:

1. That appellee waived any right of action against appellant when he consented to a later sale of the collateral;

2. That its delivery of a repossession title to an accommodation maker on the loan was not a sale or disposition of the collateral without notice to appellee; and

3. That the trial court improperly computed the damages assessed against it.

Other than a modification of damages, we shall affirm the judgment of the district court.

On April 24, 1973, plaintiff and his wife purchased a used mobile home. Since the couple, due to their ages, did not have adequate credit to finance the purchase themselves, plaintiff's father-in-law, Larry Darlington, also a defendant below, co-signed the note and security agreement as an accommodation party. The cash price of the mobile home was $1,780.00, of which $300.00 was paid by plaintiff as a down payment. The contract was then assigned by the dealer to the defendant-bank and a title to the mobile home placed in defendant's files, in either plaintiff's name alone or in the name of plaintiff and his wife, jointly. The contract in evidence specifically provides that the buyer grants to the seller and assigns a security interest "under the Uniform Commercial Code."

The monthly payments due on the loan were paid by plaintiff to defendant until August, 1975, at which time the August 5th payment was made by plaintiff's mother. By the end of September, 1975, the September 5th payment had not been made and defendant notified the dealer that the contract was in default. The defendant then, in turn, notified Darlington that the account was in jeopardy and the note would have to be paid off. Darlington contacted defendant-bank and was requested to pay the delinquent installment to bring the loan up to date.

At about this time, plaintiff and his wife were separated and plaintiff was in jail. As a consequence, Darlington requested that defendant-bank repossess the trailer so that plaintiff's wife and child could use it as a home. Defendant-bank responded that it was unwilling to physically repossess the home itself, but informed Darlington that if he could obtain possession and would pay off the balance due, it would give him title thereto. After explaining these circumstances to plaintiff's mother, Darlington obtained her permission to remove the trailer from her property, and on September 26, 1975, paid the balance due on the note. As a consequence, defendant secured a repossession title in its name, released the security agreement and transferred the repossession title to Darlington, the final effect being a transfer of title from plaintiff and his wife to Darlington. During the period in which this series of events transpired, it was known to both the defendant-bank and Darlington that plaintiff was in jail, yet he was never notified concerning either the account delinquency nor the subsequent transfer of title.

After obtaining possession and title, Darlington did repair and reconditioning work on the trailer. Following a reconciliation by plaintiff and his wife, Darlington told the couple that they could move back into the mobile home provided he received, in return, the amount of his repair investment. Instead, plaintiff and his wife agreed that the trailer should be sold and the proceeds applied first to repay Darlington for his investment, with any surplus going to plaintiff. The mobile home was ultimately sold for $1,700.00, plaintiff receiving neither any proceeds from the sale nor an accounting from Darlington with regard to the sale. Initiation of the action herein followed.

Following trial below, the district court determined, for the purpose of computing damages, that the value of the mobile home was its sale price, $1,700.00. It then allowed defendant Darlington an offset for the loan payoff made, $525.22, the labor and materials used in reconditioning the trailer, $498.88, as well as payments made to plaintiff's wife, $200.00, and entered judgment against him for $475.90. The defendant-

bank was allowed an offset for only the $525.22 payoff made by Darlington, damages of $1,174.78, thus being awarded against it. Only the defendant-bank has appealed.

■ Although not at all clear from the brief filed herein, it would appear what defendant is urging by its first point for reversal, that by consenting to the sale of the reconditioned mobile home, plaintiff in some manner waived any right to receive notice of the disposition of the loan collateral under § 34–9–504(3), W.S. 1957, 1975 Cum.Supp.[1] We cannot agree. The trial court's implicit denial of the assertion through its judgment was clearly proper. This court has acknowledged, in construing the Uniform Commercial Code, that § 34–9–501(3)(b),[2] specifically directs that notice may not be waived or varied. *Aimonetto v. Keepes*, Wyo. 1972, 501 P.2d 1017.

■ The law, as amalgamated by the Uniform Commercial Code, has retained the flexibility of making available other congruent concepts. Section 34–1–103, W.S. 1957, 1975 Cum.Supp., enunciates access to supplementary general principles of law in words as follows:

"Unless displaced by the particular provisions of this act [§§ 34–1–101 to 34–10–105], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

By that provision, the law of waiver comes into play. A party cannot be held to have waived a right based upon material facts, the existence of which he did not know. *Gorrell v. City of Casper*, Wyo. 1962, 371 P.2d 835; *Howrey v. Star Ins. Company of America*, 1934, 46 Wyo. 409, 28 P.2d 477. An effective waiver requires full knowledge of rights being waived. See also 28 Am. Jur.2d, Estoppel and Waiver, §§ 154, pp. 836–837, and 158, pp. 840–843. In the situation herein, plaintiff was never made aware of the disposition by the appellant of the collateral involved, nor of the transfer to Darlington. Without knowledge of such transactions, a valid waiver was not possible, even without the benefit of the Uniform Commercial Code.

As a second basis for reversal, defendant asserts that the accommodation maker Darlington falls within the scope of § 34–9–504(5), W.S. 1957, 1975 Cum.Supp.:

"(5) *A person who is liable to a secured party* under a guaranty, indorsement, repurchase agreement *or the like and who*

---

1. Section 34–9–504(3) reads as follows:
"(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place, and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. *Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor,* and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a

type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale." (Emphasis added.)

2. Section 34–9–501(3)(b) provides as follows:
"(3) To the extent that they give rights to the debtor and impose duties on the secured party, *the rules stated in the subsections referred to below may not be waived or varied* except as provided with respect to compulsory disposition of collateral (subsection (1) of section 34–9–505)' and with respect to redemption of collateral (section 34–9–506) but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable:

\* \* \* \* \* \*

"(b) subsection (3) of section 34–9–504 and subsection (1) of section 34–9–505 which deal with disposition of collateral;" (Emphasis added.)

*receives a transfer of collateral from the secured party* or is subrogated to his rights *has thereafter the rights and duties of the secured party. Such a transfer of collateral is not a sale or disposition of the collateral under this article."* (Emphasis added.)

Therefore, argues defendant, although Darlington was not liable under a guaranty, indorsement or repurchase agreement, he was liable in a *like manner*, as an accommodation party. Defendant thus asserts that it dealt properly with Darlington and was not required to give notice to plaintiff under the circumstances of this case because it had a right to transfer the collateral to Darlington as one in the position of a guarantor.

■ We cannot join with the defendant in that view. By issuing a "repossession title" to Darlington, the defendant-bank extinguished the plaintiff's interest, without giving him the benefit of the preceding quoted provisions of § 34–9–504 and other rights. The defendant cannot, under the circumstances of this case, be forgiven for dealing improperly with the plaintiff. Under the general provisions of the Uniform Commercial Code, "Every contract or duty within this act [§§ 34–1–101 to 34–10–105] imposes an obligation of good faith in its performance or enforcement." Section 34–1–203. "Good faith" is defined by § 34–1–201(19) to mean "honesty in fact in the conduct or transaction concerned."[3] When § 34–9–504(5) provides for a "transfer" of collateral to a guarantor, a transfer by a

secured party having the right to do so, is contemplated; for example, if the defendant had regularly received possession, as a matter of right, by reason of the default under the provisions of § 34–9–503. Upon receiving a payoff from the guarantor, the defendant could therefore have then transferred the possession to the guarantor, along with its rights as a secured party. Section 34–9–504(5) does not contemplate the complete extinguishment of the plaintiff's rights as done by a "repossession title". Defendant's conduct was not honest in fact, because it transferred title it did not have. Under the circumstances here, the plaintiff would be entitled to notice of such an irregular disposition. If the bank did not repossess, it could hardly give a "repossession" title. The defendant knew or should have known that, in fact, it had no absolute title to transfer but only a security interest.

Defendant's assertion is refuted by other provisions of the Uniform Commercial Code. The accommodation party, Darlington, is defined by the Code as "one who signs an instrument in any capacity for the purpose of lending his name to another party to it." § 34–3–415(1). If an accommodation party is called upon to pay off the instrument, he has a right of recourse, *on the instrument*, against the party accommodated, § 34–3–415(5),[4] but as a transferee of the instrument, he acquires nothing more. If the transferor has only a security agreement, that is the most the transferee can acquire. Section 34–3–201.[5] Therefore, in

**3.** The Uniform Commercial Code definition of "good faith" has been approved by this court as adaptable to other transactions, not covered by that Act. *Wendling v. Cundall*, Wyo. 1977, 568 P.2d 888, 890.

**4.** Section 34–3–415(5), W.S. 1957, 1975 Cum. Supp., provides:

"(5) An accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse *on the instrument* against such party." (Emphasis added.)

The evidence disclosed that the defendant-bank released the security instrument with an appropriate filing with the county clerk to that effect.

**5.** Section 34–3–201 provides:

"(1) Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course.

"(2) A transfer of a security interest in an instrument vests the foregoing rights in the transferee to the extent of the interest transferred.

"(3) Unless otherwise agreed any transfer for value of an instrument not then payable to bearer gives the transferee the specifically enforceable right to have the unqualified indorsement of the transferor. Negotiation

the situation at bar, the accommodation maker, Darlington, should have acquired no more interest than defendant had, i.e., a security interest. The defendant was without authority to grant Darlington title unless the requirement of notice was fulfilled as far as the plaintiff was concerned.

■ A secured party, who disposes of collateral without reasonable notification to the debtor, is liable for any loss caused by a failure to comply with the provisions of the Uniform Commercial Code. *Crowder v. Allied Investment Company*, 1973, 190 Neb. 487, 209 N.W.2d 141; *Community Management Association of Colorado Springs, Inc. v. Tousley*, 1973, 32 Colo.App. 33, 505 P.2d 1314. This remedy is specifically written into the Uniform Commercial Code by § 34–9–507(1):

> "(1) If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions. *If the disposition has occurred the debtor* or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition *has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part.* If the collateral is consumer goods, the debtor has a right to recover in any event not less than the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus ten per cent of the cash price." (Emphasis added.) [6]

■■ The defendant was guilty of conversion. Conversion is defined as any distinct act by dominion wrongfully executed over one's property in denial of his right or inconsistent with it. *De Clark v. Bell*, 1901, 10 Wyo. 1, 65 P. 852. Neither actual manual taking nor asportation is an essential element of conversion. 89 C.J.S. Trover and Conversion § 6, pp. 535–536; 18 Am. Jur.2d, Conversion, § 26, pp. 171–172. Lacking notice, plaintiff was effectively foreclosed from attempting any redemption of his collateral, as provided by § 34–9–506.[7] In addition, he was deprived of the opportunity to enjoy the possession to which he was entitled, fix up the trailer himself and became compelled to file this lawsuit to gather in his denied rights and recover damages.

Ascertainment of damages has been most troublesome but by application of § 34–1–103, UCC, an equitable remedy is made available. The trial court judgment set the value of the mobile home at $1,700.00, based on its sale approximately one month after title was taken by the bank and transferred to Darlington. The actual conversion occurred when the defendant improperly took and then transferred title to the mobile home to Darlington. Between that point in time and the mobile home's eventual sale, Darlington, as found by the trial court, invested $498.88 in reconditioning and repairs. The eventual sale price was enhanced because of the repairs.

When dealing with the tort of conversion, under the circumstances of this case, we find the computation of damages to be on a basis somewhat different than in the ordinary uncomplicated case of conversion.[8]

takes effect only when the indorsement is made and until that time there is no presumption that the transferee is the owner."

**6.** Goods are "consumer goods" if bought for use primarily for personal, family or household purposes. Section 34–9–109(1).

**7.** Section 34–9–506 states:
"At any time before the secured party has disposed of collateral or entered into a contract for its disposition under section 34–9–504 or before the obligation has been discharged under section 34–9–505(2) the debtor or any other secured party may unless otherwise agreed in writing after default re-

deem the collateral by tendering fulfillment of all obligations secured by the collateral as well as the expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and to the extent provided in the agreement and not prohibited by law, his reasonable attorneys' fees and legal expenses."

**8.** In a Wyoming case where there was failure of proof of value, the court only pointed out that the owner, suing for conversion, has the burden of proving value at the time of the alleged conversion. *Suchta v. O.K. Rubber Welders, Inc.*, Wyo. 1963, 386 P.2d 931, 934,

There is substantial authority that if the defendant is a willful or bad faith converter, the measure of damages is the full value of the converted property at the time and place, as enhanced by the converter. *Mineral Resources, Inc. v. Mahnomen Construction Company*, 1971, 289 Minn. 412, 184 N.W.2d 780; *Withers v. Tyler County Lumber Company*, Tex.Civ.App. 1959, 326 S.W.2d 173, error ref., no rev. error; *Baxter House, Inc. v. Rosen*, 1967, 27 A.D.2d 258, 278 N.Y.S.2d 442; *Terry v. Butler*, 1960, 240 La. 398, 123 So.2d 865; *Parker v. Cone*, 1933, 105 Vt. 426, 168 A. 715; 89 C.J.S. Trover and Conversion § 169, p. 647; 18 Am.Jur.2d, Contribution, § 94, p. 131, 4 Restatement of the Law, Torts, § 927, p. 651.

As stated in *Mineral Resources*, the salutary purpose of the rule in holding the willful converter, is to discourage the conversion of another's property. If a willful converter were liable only for the market value of the converted property at the time it was taken, there would be no effective deterrent. In *Baxter*, the court declared that equity will trace property taken by a converter and impress a trust upon any property into which the property taken may have been transformed and gather in any increment. The Uniform Commercial Code has carried forward the concept of deterrence, if not the language, when in § 34–9–507(1) it provides upon failure to give notice of disposition that:

" * * * If the collateral is consumer goods, the debtor has a right to recover *in any event* an amount not less than the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus 10 per cent of the cash price." (Emphasis added.)

█ While we cannot overlook the legislative policy of imposing an obligation of good faith on lenders and that the defendant-bank falls within the Uniform Commer-

cial Code definition of bad faith, we can treat plaintiff's claim as one described in 18 Am.Jur.2d, supra, and compute the damages on the basis of the benefit to the wrongdoers, rather than allowing full value as enhanced. We use the plural advisedly. The bank and Darlington were sued jointly and it is obvious that it took their joint action to create the damage caused the plaintiff. As said in 18 Am.Jur.2d, Conversion, § 140, p. 243:

"In the proper circumstances, two or more persons may be joined in an action for conversion * * * as parties defendant, such as where they participated together in the conversion. * * * "

That statement of the rule was carried into effect by *Hart v. Herzig*, 1955, 131 Colo. 458, 283 P.2d 177, which held that all those who participate actively in any manner in the commission of a tort are jointly and severally liable therefor, it being indivisible.

Returning now to a consideration of the benefit to the tortfeasors as recoverable by the plaintiff, *Howard v. Swift*, 1934, 356 Ill. 80, 190 N.E. 102, discusses the rule of damages whereby the benefit or gain is enrichment by the tortfeasor, which he is bound to restore to the injured party by reason of his improper and wrongful acts. While such an approach is dealt with as a principle of assumpsit equitable in nature, the original act of conversion never really loses its identity as a tort because if it did, there would be no real basis for the eventual relief afforded. The subject is dealt with in Annotation, "Owner's right to waive tort of conversion and maintain action on contract implied at law to recover profits which inured to converter from wrongful use of chattel", 169 A.L.R. 143. There is, in fact, no waiver of the tort.

█ The plaintiff's claim, as set out in his complaint, is for the benefit gained by the joint tortfeasors' action. If a benefit is

citing *Redwine v. Fitzhugh*, 1958, 78 Wyo. 407, 329 P.2d 257, 72 A.L.R.2d 664, reh. den., 78 Wyo. 426, 330 P.2d 112, not a conversion case but dealing with crop damage. The case of *Hamco Oil and Drilling Company v. Ervin*, Okl. 1960, 354 P.2d 442, also cited in *Suchta*, points

out its rule of damages for conversion is the highest value between date of conversion and verdict. The other case cited in *Suchta* was one in which the award of damages exceeded the evidence of loss. This court has never decided a case such as the one now before us.

derived by the wrongdoers, recovery may be had on the basis of a promise implied in law and the benefit recovered. *Ablah v. Eyman*, 1961, 188 Kan. 665, 365 P.2d 181, 90 A.L.R.2d 766; *Creach v. Ralph Nichols Co.*, 1953, 37 Tenn.App. 586, 267 S.W.2d 132; *Swope v. Pageton Pocahontas Coal Co.*, 1947, 129 W.Va. 813, 41 S.E.2d 691; *Olwell v. Nye & Nissen Co.*, 1946, 26 Wash.2d 282, 173 P.2d 652, 169 A.L.R. 139; *Felder v. Reeth*, 9 Cir. 1929, 34 F.2d 744. See also the discussion in Restatement of the Law, Restitution, on recovery of benefits tortiously acquired, beginning at p. 522, and Oleck, Damages to Persons and Property, 1961, § 206, p. 371, et seq.

The touchstone of the rule is the moral obligation arising out of unjust enrichment to the tortfeasor. The principle is of ancient origin.[9] It has lost its early common law fictions and is firmly entrenched as a cause of action with only its "historical echoes" remaining.

 Computing the damages on the basis of the benefit received by the tortfeasors, though Darlington has the money from the sale, it appears that from the sale price of $1,700.00 there would be deducted the sum of $525.22 payoff, leaving the sum of $1,174.78, from which should be deducted the further sum of $498.88 cost of repairs, with a net result of $675.90 as a tortfeasor benefit.

 Even though we did not reach the foregoing conclusion, through the route taken, we could reach the same approximate money amount, at least as to the bank, in another way. The law is well settled and extensive that even though a plaintiff may fail in his proof of actual damages but can establish a conversion, he is still entitled to nominal damages for the wrong done him. 89 C.J.S. Trover and Conversion § 161, p. 642, 18 Am.Jur.2d, Conversion, § 93, p. 217. Once that entitlement is established, the plaintiff becomes eligible for the rule-of-thumb damages provided by § 34–9–507(1):

" * * * If the collateral is consumer goods, the debtor has a right to recover *in any event* an amount not less than the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus 10 percent of the cash price." (Emphasis added.)

A computation from the Uniform Commercial Code contract in question would be as follows:

| | |
|---|---|
| Credit service charge | $460.12 |
| 10% of debt (1,480.00) | 148.00 |
| | $608.12 |

 Our granting of appellate relief is complicated by the absence of Darlington in the case on appeal. There should have been a joint and several judgment entered against the bank and Darlington, to avoid a double recovery, not favored by the courts, 49 C.J.S. Judgments § 68, p. 188. He has never been treated as and is not now a party to this appeal. A person, not a party to an appeal, is not affected or concluded thereby. *Riffle v. Sioux City and Rock Springs Coal Mining Co.*, 1912, 20 Wyo. 442, 124 P. 508. However, we can control any claim of the plaintiff, as an appellee here, and grant him only a joint and several judgment against the bank and Darlington, thus avoiding the allowance of double recovery, granted by the district court.

 The trial court should have granted Darlington's counterclaim in the sum of $200.00, rather than treating it as an offset in the separate judgment against him. The $200.00 item bears no relation to the mobile home transaction but was for moneys had and received for the plaintiff's benefit in the support of his wife. It cannot be allowed as a credit against the joint and several judgment because the defendant-bank was a stranger to that $200.00 piece of business. Any question with respect to a contribution from the joint tortfeasor, by whoever pays the joint and several judgment, can be settled in a separate action

---

**9.** An extremely interesting and informative article, authored by Arthur L. Corbin of Corbin on Contracts, entitled "Waiver of Tort and Suit in Assumpsit", appears in XIX Yale L.J., p. 221, published in 1910, wherein the history is traced to the English law and the statute of Westminster II in the time of Edward I.

under the provisions of § 1–7.3, W.S. 1957, 1975 Cum.Supp., et seq, pertaining to contribution among joint tortfeasors.[10]

We must modify the judgment of the district court by fixing the damages assessed at $675.90 and direct the district court to enter a joint and several judgment against defendant-bank and Darlington in that amount.

Affirmed as modified.

GUTHRIE, C. J., and THOMAS, J., concur.

ROSE, J., filed a partially concurring and partially dissenting opinion in which McCLINTOCK, J., joined.

ROSE, Justice, partially concurring and partially dissenting, with whom McCLINTOCK, Justice, joins.

I would agree with the majority's conclusion that, given the irregular character of the disposition herein, the bank violated the notice requirements of § 34–9–507(1), W.S. 1957, 1975 Cum.Supp.

Although the parties concede that the damages recoverable are those for conversion under § 34–9–505(1), W.S.1957, 1975 Cum.Supp.—a concession with which I have some concern, since there *was* a disposition within ninety days—no damages as of the time of the conversion (when title was improperly transferred to Darlington) were shown. The only damage evidence bearing upon the trailer's value at this time shows that it was worth less than the outstanding debt. As a result, plaintiff could take nothing under that portion of his claim. *International Distress Signals v. McDowell*, Wyo., 519 P.2d 224, 226. There being no evidence that the bank acted in bad faith, and no indication that plaintiff ever sought recovery on the basis of an implied contract, I fail to see any justification in applying any exception to the traditional measure of damages for conversion.

Rather than forcing a strained construction of damage rules, and rather than finding a non-appealing party to be a joint tortfeasor, I would have held that the plaintiff was entitled to recover, under the minimum penalty provisions of § 34–9–507(1), supra, the sum of $608.12 from the bank. The statutory penalty is tailored to deter creditor misbehavior, without requiring proof of actual damage. White & Summers, Uniform Commercial Code, § 26–14 (1972). We need not misuse other rules of law to achieve that result.

---

**10.** Section 1–7.3, after allowing for contribution among joint tortfeasors, provides:

"(d) As used in sections 1–7.3 through 1–7.6 of the statutes, 'joint tort-feasor' means one or two or more persons jointly or severally liable in tort for the same injury to person or property, *whether or not judgment has been recovered against all or some of them*." (Emphasis added.)

See also Comment, "Wyoming Contribution Among Joint Tort Feasors", IX Land and Water L.Rev. 589.