### Vermont Industrial Development Authority v. Paul C. Setze, Patricia J. Setze, Gordon D. Oxx, Jr., and Carol P. Oxx

[600 A.2d 302]

No. 89-028

Present: **Allen, C.J., Gibson, Dooley and Johnson, JJ., and Peck, J. (Ret.), Specially Assigned**

Opinion Filed October 11, 1991

*Nancy J. Creswell* and *Emily B. Tartter* of *Paterson & Walke, P.C.*, Montpelier, for Plaintiff-Appellee.

*Robert A. Gensburg* of *Gensburg Axelrod & Adler*, St. Johnsbury, for Defendants-Appellants Setze.

*Michael J. Hertz* of *Hertz and Wesley*, Brattleboro, for Defendants-Appellants Oxx.

**Johnson, J.** Defendants Paul and Patricia Setze appeal from a ruling on a motion for summary judgment, holding them liable to the plaintiff, Vermont Industrial Development Authority (VIDA), for the plaintiff's losses on a contract insuring a commercial loan. Defendants Gordon Oxx and Carol Oxx settled with VIDA prior to argument and are no longer parties to this appeal. We affirm the trial court judgment with respect to the remaining parties.

The underlying facts are not in dispute. In 1984, defendants created Precision Technologies, Inc., (PTI) for the purpose of manufacturing and selling ultra-precision surgical tools. The venture was financed in part by a loan from First Vermont Bank and Trust Company (Bank), which was secured by an interest in

PTI's machinery and equipment. As an inducement to the Bank to finance PTI's venture, VIDA agreed to insure the loan. The insurance agreement provided that, in the event of default by PTI, the Bank would pursue its remedies under the security agreement, after first obtaining written consent from VIDA, and apply any proceeds to the principal outstanding on the loan. VIDA would then indemnify the Bank for seventy-one percent of the remaining principal. Defendants, in a separate document, entered into a Guaranty and Indemnity Agreement with VIDA, personally agreeing to indemnify VIDA for any sums it paid to the Bank under the insurance agreement, plus any expenses of collection, and to waive all defenses.

PTI defaulted on the loan, and the Bank took control of the collateral and sold it. The collateral was valued at $543,590. Initially, the Bank notified interested parties that it would sell the collateral as a package on a bid basis, setting the minimum bid at $550,000. It sold the equipment for $325,000 to a single bidder, with VIDA's approval. The sum was applied to the principal due on the loan, and VIDA paid the Bank seventy-one percent of the remaining principal. VIDA then sued defendants on their guaranty, seeking reimbursement for the sum paid to the Bank.

On VIDA's motion for summary judgment, the trial court held that the Guaranty and Indemnity Agreement was an enforceable contract and that defendants set forth no legally valid defenses to liability. This appeal followed.

Defendants contend that the trial court erred in rejecting their defenses, which were grounded on Article 9 of the Uniform Commercial Code. They rely on two theories in an attempt to circumvent liability. They argue that in the overall financing scheme, VIDA was the real secured party and that they are, therefore, the guarantors of a secured loan entitled to certain protection under Article 9 of the Code. Under Article 9, a secured party must notify a guarantor of a secured loan of a sale of the collateral, and the right to notice cannot be waived. *United States v. Lang*, 621 F. Supp. 1182, 1184 (D. Vt. 1985); *Vermont National Bank v. Hamilton*, 149 Vt. 477, 484, 546 A.2d 1349, 1353 (1988). A secured party cannot recover any deficiency from a guarantor in the absence of notice. *Vermont National Bank*, 149 Vt. at 481–82, 546 A.2d at 1352. Moreover, a secured party seeking a deficiency from a guarantor must plead

and prove a commercially reasonable sale of the collateral. *Chittenden Trust Co. v. Maryanski*, 138 Vt. 240, 246, 415 A.2d 206, 210 (1980). VIDA, which takes the position that it is not a secured party, did not notify defendants of the sale of the collateral nor did it plead and prove a commercially reasonable sale.

Defendants also contend that the Bank's sale of the collateral was commercially unreasonable. Therefore, they argue that VIDA was not legally liable to the Bank under its insurance agreement, and they, as sureties of the insurance agreement, are not liable to VIDA.

On appeal from a grant of summary judgment, the moving party at trial "must satisfy a two-part test. It must establish that no genuine issue of material fact exists, and that the motion rests on a valid legal theory that entitles it to judgment as a matter of law." *Kelly v. Town of Barnard*, 155 Vt. 296, 299, 583 A.2d 614, 616 (1990). The facts relevant to this appeal are undisputed; thus, our inquiry is limited to analysis of the legal theories underlying the grant of summary judgment.[1]

## I.

The first issue is whether Article 9 of the U.C.C. applies to the Loan and Guaranty Agreement between defendants and VIDA. Article 9 applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures." 9A V.S.A. § 9—102(1). Under Article 1—201(37), a "security interest" is an "interest in personal property or fixtures which secures payment or performance of an obligation." A secured party is "a lender, seller or other person in whose favor there is a security interest." 9A V.S.A. § 9—105(1)(i). The principal test for determining whether a transaction is covered by Article 9 is whether the transaction is intended to have effect as security. 9A V.S.A. § 9—102, Uniform Laws Comments at 605. Security interests under Article 9 are consensual, and do not ordinarily arise by operation of law. Cf. *In re Bollinger Corp.*, 614 F.2d 924, 928 (3d Cir. 1980) (under Article 9, parties must intend to create a security interest in the collateral).

---

[1] Whether or not the Bank's sale of the collateral was commercially reasonable remains a disputed issue of fact; however, it is not necessary to resolve it in view of our disposition on the legal issues.

■■ To create a valid and enforceable security interest under Article 9, there must be, at a minimum, a written security agreement that describes the collateral and is signed by the debtor. 9A V.S.A. § 9—203. Section 9—203 operates in the manner of a Statute of Frauds. Its function is to minimize disputes about the existence of an agreement. J. White and R. Summers, Uniform Commercial Code, ch. 22, at 967–68 (1988). Notwithstanding compliance with § 9—203, a security interest will not attach, or actually come into being, until the secured party gives value and the debtor acquires rights in the collateral. 9A V.S.A. § 9—204.[2]

■ There is a narrow exception to the rules outlined above, which is found in 9A V.S.A. § 9—504(5). Under that section, unsecured creditors with rights in collateral may acquire the rights and obligations of secured creditors if, in effect, they displace the secured creditor by receiving a transfer of collateral or becoming subrogated to the secured party. 9A V.S.A. § 9—504(5).

The issue, then, is whether this transaction evidences an intent to create a security interest in VIDA, or in the alternative, comes within the scope of § 9—504(5). The only express security interest in the various documents that comprise the transaction is the Bank's security interest in PTI's machinery and equipment. Further, it was the Bank, not VIDA, which gave value to the debtor, PTI, in exchange for the security interest. Thus, there was no agreement, no description of the collateral, and no value given by VIDA to the debtors in exchange for a secured interest. In short, there was no compliance with any of the basic requirements necessary to create a valid and enforceable security interest in the Guaranty and Indemnity Agreement between defendants and VIDA. §§ 9—203 and 9—204.

Defendants urge us to consider the transaction as a whole, arguing that VIDA should be considered the "true" secured party because it had the right, pursuant to its insurance policy

---

[2] 9A V.S.A. § 9—204 states, in part: A security interest cannot attach until there is agreement . . . that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching.

with the Bank, to control and approve the disposition of the collateral, and because it directly benefited from its sale. Defendants' argument would require us to overlook all Article 9 documentation requirements and to look beyond the specific document creating the obligation on which VIDA brought suit. The hurdles that confront such an approach are insurmountable.

■ The right to control the collateral and to benefit from the proceeds of its sale are not sufficient, in and of themselves, to create an Article 9 security interest. §§ 9—203 and 9—204. It is true that courts will sometimes supply a missing element of § 9—203, such as a description of the collateral, or a security agreement clause in a note or other evidence of indebtedness, if it is clear from evidence in addition to the documents that the parties intended the transaction to be secured. See *In re Numeric Corp.*, 485 F.2d 1328, 1331 (1st Cir. 1973) (combination of a financing statement and a corporate director's resolution were sufficient to form a security agreement). But defendants have cited no cases in which courts have been willing to overlook all of the documentation requirements of Article 9, and to find an intent to create a security interest where those requirements are wholly unsatisfied. The cases cited by defendants are either factually distinguishable, deal with matters not here at issue, or stand for propositions that do not resolve this case.

■ Moreover, this is not a case in which the documents raise any ambiguity as to the nature and terms of the transaction. The record contains at least three documents pertinent to the transaction. The preamble to the personal guaranty agreement specifically recognizes that, without mortgage insurance issued by VIDA and defendants' personal guaranty to VIDA, there would have been no bank financing for defendants' business venture.[3] The personal guaranty, with a waiver of all defenses, was the quid pro quo for the transaction. Given these express provisions in the agreement before us, VIDA's rights in the collateral that derive from its insurance policy with the Bank provide little support for the notion that the defendants' personal

---

[3] See 10 V.S.A. § 221(c)(10)(A) (VIDA may issue mortgage insurance if mortgagor is unable to secure financing on reasonable terms).

guaranty to VIDA was intended to be secured. Coupled with the lack of any compliance with Article 9 documentation requirements, which must weigh heavily in determinating the intent of the parties, we cannot conclude that VIDA was a secured party.

## II.

Defendants' second contention is that VIDA assumed the rights and obligations of a secured party under § 9—504(5). It appears that VIDA was "liable to a secured party under a guaranty, indorsement, repurchase agreement or the like," which is the threshold requirement of § 9—504(5), but would only acquire the secured party's "rights and duties" if it "receive[d] a transfer of collateral from the secured party or [was] subrogated to his rights." *Id.* It is undisputed that, although VIDA had the right to repurchase the note and therefore obtain the right to control the collateral on default, VIDA did not exercise that right. Therefore, it did not receive a transfer of collateral from the Bank within the meaning of § 9—504(5).[4]

Further, by paying a portion of the amount owed to the Bank pursuant to its insurance contract, VIDA did not become subrogated to the Bank. Therefore, it did not assume the rights and duties of a secured party by subrogation. "[T]he right of a [party secondarily liable] to be subrogated . . . does not attach unless all the principal obligations are discharged." *Walker Process Equipment Co. v. Cooley Building Corp.*, 129 Vt. 333, 340, 278 A.2d 714, 718 (1971); see *International Underwriter Brokers, Inc. v. Liao*, 548 So. 2d 163, 164 (Ala. 1989) (an insurer has no right of subrogation "until the insured has recovered an amount in excess of his or her loss"); *Lombardi v. Merchants Mutual Insurance Co.*, 429 A.2d 1290, 1291–92 (R.I. 1981) (same); 16 Couch on Insurance 2d § 61:64 (rev. ed. 1983).

---

[4] The Code does not define "transfer of collateral," but cases imply that there must be a transfer of title before an assignee acquires the rights and obligations of the secured party. See *Western National Bank of Casper v. Harrison*, 577 P.2d 635, 639 (Wyo. 1978) (no transfer of collateral occurred where bank had not repossessed property, did not have title to property, and attempted no transfer of collateral to guarantor); *CIT Financial Services v. Herb's Indoor RV Center, Inc.*, 118 Idaho 185, 191, 795 P.2d 890, 896 (Ct. App. 1990) (Burnett, J., dissenting) (physical placement of collateral with guarantor, unaccompanied by title, did not constitute transfer).

■ In two special circumstances, however, a party secondarily liable may be subrogated even though the principal creditor has not recovered in full. These are (a) where the principal creditor does not object to subrogation, and (b) where a contract specifically provides that the party secondarily liable will be allowed to subrogate to the extent he or she reimburses the creditor. *Willard v. Automobile Underwriters, Inc.*, 407 N.E.2d 1192, 1193 (Ind. App. 1980); Couch on Insurance 2d § 61:66; see 4 Debtor-Creditor Law, § 19.03[C], at 19–13–14.

VIDA's right to purchase the note in the event of default did not constitute an agreement to subrogate. Further, not only was there no evidence from which the trial court could conclude that the Bank consented to subrogation, logically, there was no reason for VIDA to become subrogated, since it had the right to proceed against defendants personally on the Guaranty and Indemnity Agreement. Thus, VIDA did not acquire the obligations of a secured party by subrogation. Cases cited by defendants[5] are inapposite.

■ Since VIDA was not a secured party, either by agreement or by operation of 9A V.S.A. § 9—504(5), defendants were not guarantors of a secured transaction, and VIDA owed them no duties imposed by Article 9.[6] Our holding does no violence to any public policy inherent in Article 9. Article 9 does not protect against unfair or incompetent dispositions of collateral under all circumstances. It protects only transactions that satisfy its criteria.

---

[5] *Mid-States Insurance Co. v. American Fidelity & Casualty Co.*, 234 F.2d 721, 731 (9th Cir. 1956) (subrogation found although the entire loan principal not discharged because principal creditor failed to object and would recover the entire sum loaned); *Tucker v. Scarbrough*, 268 Ark. 736, 739–40, 596 S.W.2d 4, 7 (Ct. App. 1980) (debtor had no standing to object to subrogation of guarantor since principal creditor did not object).

[6] Defendants argued in the alternative that Article 9 applied to the transaction because the Bank was VIDA's agent in disposing of the collateral. As discussed *infra*, VIDA's right to approve the sale of the collateral did not impose any Article 9 obligation on it, unless it met the narrow terms of § 9—504(5), which it did not.

## III.

Defendants' final contention is that they are not liable on their personal guaranty agreement because VIDA was not, in fact, liable to the Bank on the insurance agreement. Their claim is that VIDA's insurance contract was essentially a suretyship, which entitled it to assert the defenses of its principal, PTI, against the Bank. Thus, as surety, VIDA should have asserted PTI's defense of a commercially unreasonable sale of the collateral, and its failure to do so should bar VIDA's recovery on the defendants' personal guaranty agreement.

Defendants' surety argument ignores the plain and unambiguous terms of the personal guaranty, in which defendants agreed to reimburse VIDA for any sums VIDA paid to the Bank. The agreement stated:.

> *Obligation*: The Guarantors, jointly and severally, guarantee to the Lender, its successors and assigns, that they will pay to the Bank any amount for which the Authority becomes liable to the Bank pursuant to the said Mortgage insurance Agreement and *will indemnify the* Bank pursuant to said agreement . . . .

Defendants also agreed to ratify any "settlement or compromise" between VIDA and the Bank, and "waived[d] all defenses, counterclaims, or offsets" they might have had. In light of these provisions, it is not necessary to resolve the issue of suretyship. That, and any other defense defendants may otherwise have had, were waived.

*Affirmed.*