901 P.2d 1107 (1995)
H. Douglas MILLER and Danene R. Miller, individually and as conservator(s) of Laura K. Miller, Lindy L. Miller and Clint T. Miller, minors; Steve Adams and Peggy Adams, individually and as conservator(s) of Christie Adams and Jamie Adams, minors; Scott G. Anderson and Tobey J. Anderson, individually and as conservator(s) of Michael Todd Anderson, Chanel S. Anderson, and Tobin P. Anderson, minors; Paul D. Bailey, Jr.; Roxanne G. Randall; Robert L. Bailey, Della A. Bailey, individually and as conservator(s) of Della Larae Bailey, a minor child; Leroy D. Barnett; Betty C. Barnett; Susan Bechtel, individually and as conservator(s) of Laurie Johnson, Lisa Johnson, and Steven Bechtel, minors; Roger Biesheuvel and Joanne Biesheuvel, individually and as conservator(s) of James Biesheuvel and Justin Biesheuvel, minors; James J. Birgen and Donna J. Birgen, individually and as conservator(s) of Joseph J. Birgen, Rebecca A. Birgen and Jeffrey J. Birgen, minors; Gabriel Bueno; Barbara Gutierrez, individually and as conservator(s) of Lori Gutierrez, Leanne Gutierrez, and Lexis Gutierrez, minors; Jimima Bulkley, individually and as conservator(s) of Elena Bulkley, a minor; Kenneth E. Burr, Twyla A. Burr, individually and as conservator of Bridgett Burr, Staci Burr, and Travis Burr; Martha M. Cain, conservator of Forrest Cain and Foster Cain, minors; Delbert H. Carson; Clio L. Carson; Ernest Champion and Kathy L. Champion, individually and as conservator(s) of Lacy J. Champion, a minor; Russell Conley and Catherine Conley, individually and as conservator(s) of Candace A. Conley and Bridgette A. Conley, minors; Chloe Jean Conrad, individually and as conservator(s) of Michelle L. Parker, and Robin A. Parker, minors; Kyle L. Craig and Julianne S. Craig, individually and as conservator(s) of Darin K. Craig and Dustin Joseph Craig, minors; Michael L. Dennis and Marieta R. Dennis, individually and as conservator(s) of Sarah M. Dennis, a minor; David L. Dorson and Vicky Dorson, individually and as conservator(s) of Sean Dorson and Amber Dorson, minors; John N. Downey and Patricia G. Downey, individually and as conservator(s) of Christopher S. Downey, Catherine N. Downey, Coral Downey and Conrad J. Downey, minors; Dennis P. Duncan; Marianne L. Duncan; Glenn R. Edwards and Jean M. Edwards, individually and as conservator(s) of Craig A. Edwards, Cory G. Edwards and Carey J. Edwards, minors; Steven W. Feddersen and Vicki J. Feddersen, individually and as conservator(s) of Brandi Feddersen, Amber Feddersen, Crystal Feddersen, and Lance Feddersen, minors; Howard E. Foskett and Nguyen Foskett, individually and as conservator(s) of Jack Foskett and Patty Foskett, minors; Donald P. French and Martha French, individually and as conservator(s) of Kaylene French and Marlaina French, minors; Thomas Fries and Luann Fries, individually and as conservator(s) of Krista Fries, Jarred Fries, and Janell Fries, minors; Ron R. Hedlund, individually and as conservator(s) of Veronica Ray Hedlund, a minor; Steven G. Hill and Josefina Hill, individually and as conservator(s) of Andrew J. Hill, Christopher J. Hill, and Joseph L. Hill, minors; James H. Kelley and Alinda K. Kelley, individually and as conservator(s) of James B. Kelley and Windy K. Kelley, minors; Charles R. Kiesel and Dawn M. Kiesel, individually and as conservator(s) of Jennifer D. Kiesel, a minor; George A. Labbe; Marilynn C. Labbe; Mary Godley Little; Samuel E. Lord, Sr.; Jeraldine D. Lord; Wayne J. Manning and Marie Manning, individually and as conservator(s) of *1108 Thomas Manning, a minor; Kenneth L. McCoy and Kathleen G. McCoy, individually and as conservator(s) of Benny Dial, Brian McCoy, Kevin McCoy and Jeremiah McCoy, minors; Randall D. Meyer and Cynthia A. Meyer, individually and as conservator(s) of Stacey Meyer, Travis Meyer and Alicia Meyer, minors; Raymond G. Miller and Connie J. Miller, individually and as conservator(s) of Shawn L. Miller, Shane T. Miller and Bryan G. Miller, minors; Matt E. Niemitalo; David E. Nelson, individually and as conservator(s) of Misty K. Nelson, David J. Nelson and Adam C. Nelson, minors, Bonnie O'Blasney, individually and as conservator(s) of Jeremy O'Blasney, a minor; Randall L. Omvig and Ellen G. Omvig, individually and as conservator(s) of Jacob J. Omvig, Joshua L. Omvig, and Rachel Lou Omvig, minors; Ralph Oswald and Frances J. Oswald; Brad Russell; Roger Pfeil and Linda Pfeil, individually and as conservator(s) of Ronnie Pfeil, Robert Pfeil, Ryan Pfeil, Richard Pfeil, and Christina Pfeil, minors; Virginia Reed, individually and as conservator of Tyler Miller and Ross Reed, minors; Darrell Rogers and Katherine Rogers, individually and as conservator(s) of Randy Rogers and William Rogers, minors; Robert R. Rosier; Elsie Rosier; William M. Savage and Diane L. Savage, individually and as conservator(s) of Scott R. Miller, Wendy L. Miller, Cory J. Miller, Chris M. Savage, Laura D. Savage, Tara L. Savage and Kathy L. Savage, minors; Lyle H. Schillinger and Marjorie Schillinger, individually and as conservator(s) of Angel Schillinger, Jeremy Schillinger, Melissa Schillinger and David Schillinger, minors; William M. Schmidt and Cindy Schmidt, individually and as conservator(s) of Luke Schmidt and Zach Schmidt, minors; Robert J. Schweitzer and Debra R. Schweitzer, individually and as conservator(s) of Heather James, Christy Porter and Dennis Schweitzer, minors; Ricky D. Shank and Lavonna L. Shank, individually and as conservator(s) of Troy E. Shank and Cory D. Shank, minors; Steven P. Skinner and Solidad R. Skinner, individually and as conservator(s) of Suzanna J. Skinner and Steven P. Skinner, Jr., minors; Howard Spears and Mavis A. Spears, individually and as conservator(s) of Sherry L. Spears and Michael L. Spears, minors; Victor Suhr and Gloria Suhr; Daniel Suhr; Burl H. Tabor and Luraetta K. Tabor; Dennis J. Uran and Ginger R. Uran, individually and as conservator(s) of Shawna Uran, Beau Uran, and Abby Uran, minors; Raymond C. Wall and Adah Wall, individually and as conservator(s) of Dusty Wall, a minor; W. Ben Wieser and Linda L. Wieser, individually and as conservator(s) of David Lee Mines, a minor; Brian Witt and Cindy Witt, individually and as conservator(s) of Chance Witt, Riley Witt, and Abby J. Witt, minors; Ricky L. Swanson and Kathy Swanson, individually and as conservator(s) of Amber Swanson, Aurora Swanson and Waylon Swanson, minors; Gerald L. Wilk and Billie Jo Wilk, individually and as conservator(s) of Sabrina Wilk, a minor; Mary Lou Carroll; Carl Len Black and Jane Black, individually and as conservator(s) of Jessica L. Black and Jamie L. Black, minors; Billy Gene Brown and Peggy Jo Brown, individually and as conservator(s) of Carrie Lynn Brown, a minor; Raquel Lea Randolph; Michael William Brown; Sherrie M. Brown, individually and as conservator of Lacey Brown and Joshua Brown, minors; Steven Joe Dutton and Rachel Ann Dutton, individually and as conservator(s) of Steven S. Dutton, Alysa Rae Dutton, and Danita Jo Dutton; Thomas N. Falk, II; Bonnie Lou Falk, individually and as conservator of Thomas N. Falk, Jr., Kristofer J. Falk, Sherri Beth Falk, Nicholas S. Falk, minors; Dennes Foy and Patricia Foy, individually and as conservator(s) of Christopher Foy and Stacy L. Foy, minors; Gerald D. Green; Thomas E. Harrison and Carol Harrison, individually and as conservator(s) of Noel E. Harrison and Edward L. Harrison, minors; David Krog, individually and as conservator of Chrystal Krog and Mitchelle Krog, minors; Hugh A. Polly; Johnnie Marie Polly; Frank *1109 Seip and Julene Seip, individually and as conservator(s) of Afton Seip and Sunny L. Seip, minors; Teresa E. (Paxton) Lish, individually and as conservator(s) of Travis L. Carroll and Jennifer Kuhn, minors; Leo L. Sherrodd; Charlotte A. Sherrodd; Glenn E. Webb; Leona Webb; Ron Just and Susan Just, individually and as conservator(s) of Christopher J. Just, Michael A. Just and Nicholas A. Just, minors; Douglas R. Roe and Carol M. Roe, individually and as conservator(s) of Robert D. Roe and Michael R. Roe, minors; Timothy M. Strawn and Carrie L. Strawn, individually and as conservator(s) of Stefanie Strawn, Abigail Strawn, and Lucas Strawn, minors, Appellants (Plaintiffs),
v.
CAMPBELL COUNTY, Wyoming; Board of County Commissioners of the County of Campbell; Bill Barkley, Thomas Ostlund, and Mickey Wagensen; Campbell County Sheriff's Department, Campbell County Health Department; Campbell County Engineer's Office; Campbell County Fire Board; and Campbell County Emergency Services Agency, Appellees (Defendants).
No. 94-200.
Supreme Court of Wyoming.
August 25, 1995.
*1110 Gary L. Shockey and Heather Noble of Spence, Moriarity & Schuster, Jackson, for appellants.
Dominique D.Y. Cone, Blair J. Trautwein and Rick A. Thompson of Hathaway, Speight, Kunz & Trautwein, Cheyenne, for appellees.
Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.
THOMAS, Justice.
The question presented in this appeal is novel to Wyoming, and it is substantially unique in American jurisprudence. Can the collateral source rule be invoked in favor of plaintiffs who are seeking compensation for inverse condemnation? The appellants in this case (homeowners) were ordered to evacuate their residences in a subdivision of Gillette known as Rawhide Village Subdivision. The reason for the evacuation was the presence of methane and hydrogen sulfide gases emerging from the coal deposits underlying the subdivision, to the extent that one could light a match and set the street on fire. The homeowners received, in various amounts, an aggregate of $2 million from the Abandoned Mine Reclamation Fund of the United States government and, in some instances, the Federal Housing Administration and the Veterans Administration forgave mortgage indebtedness. They also sought compensation from Campbell County (County) for inverse condemnation, but they wanted to foreclose proof of amounts they received which either reduced the indebtedness on their homes or compensated them for loss of equity. A second issue is raised with respect to whether evidence concerning the cost of replacement homes and additional mortgage costs can be presented in a condemnation case. The trial court ruled the collateral source rule does not apply in this case, and indicated it would not consider evidence of damage other than the difference in fair market value of the homeowners' properties before and after the taking. We affirm the district court with respect to the application of the collateral source rule but, in each instance, the evidence with respect to damages is going to depend on whether the taking was a total taking or a partial taking. The record does not inform us in that regard, and we cannot resolve the second issue.
In their Brief of Appellants, the homeowners present these issues for review:
(1) Whether the collateral source rule applies to this case.
(2) Whether, under the circumstances of this case, the jury should be allowed to hear and consider evidence about the replacement homes which Plaintiffs were forced to buy and the mortgages which Plaintiffs were forced to assume after Campbell County suddenly and unexpectedly condemned their homes.
Campbell County, in the Brief of Appellees, states the issues to be:
I. Does the collateral source rule apply to allow double recovery of loss in a condemnation case?
II. Are payments received from the government collateral sources of recovery in a condemnation case?
III. Does "just compensation" include costs incurred in purchasing replacement property?
This case is a sequel to Miller v. Campbell County, 854 P.2d 71 (Wyo.1993) (Miller I), in which we held the homeowners could not recover for emotional distress as an element of the just compensation awarded in an inverse condemnation action. A complete *1111 statement of the factual background of these cases is set forth in the court's opinion in Miller I. In Miller I, the court alluded to the facts that the homeowners received federal relief aid and also $2 million from the Abandoned Mine Reclamation Fund.
Subsequent to our decision in Miller I, the County filed another Defendants' Motion for Partial Summary Judgment, in which it asserted the collateral source rule could not be applied in an inverse condemnation case. The County contended that, if the court found a taking, it should take into consideration the monies received by the several homeowners from other governmental sources. The County persuaded the trial court that it should deduct these amounts from any award for just compensation the County would be required to pay, leaving the County responsible only for the difference. The district court entered its Order Granting Defendants' Motion for Partial Summary Judgment, ruling the collateral source rule would not apply in the case and those homeowners who had been fully compensated for the fair market value of their property should be dismissed from the action.
At the hearing on the County's Motion for Partial Summary Judgment, which addressed the application of the collateral source rule, the following colloquy occurred with respect to the nature of the $2 million in Abandoned Mine Reclamation Fund monies received by the homeowners:
MR. TRAUTWEIN [Counsel for Campbell County]: Your Honor, to continue, in the AML [Abandoned Mine Reclamation Fund monies] funds there were two types of monies given: Monies to help pay off the mortgage and monies for the equity value.
THE COURT: Now, that's which money?
MR. TRAUTWEIN: The AML fund money, Your Honor.
* * * * * *
MR. TRAUTWEIN: Well, the AML funds were directly thatYour Honor, that's exactly what they were intended to be, was compensation for property, for the debt relief and for the equity in the property.
Later, in regard to specific losses to a particular homeowner, co-counsel for the County and counsel for the homeowners engaged in this dialogue:
MR. WOLFE: Now, they [Andersons] received AML funds, Your Honor. They received several different kinds of funds. They received rent assistance. They received mortgage payments. And they also received an equity payment, which was done by another appraisal on the property. They determines [sic] how much equity the government determined from their provision how much equity they had in the property over and above the mortgage, which had been forgiven, and they paid them that.
They paid the Andersons $9,617.60, so the Andersons actually, if we assume that they gave up their property, that there was a taking, they've already received the total amount of the value of their property.
THE COURT: Now, who was it that paid that 9,700?
MR. WOLFE: AML funds. But it was for equity funds. That's the answer to your question. These guys probably know who the AML is.
MR. SHOCKEY: Abandoned Mine Land. The folks over in Rock Springs were real mad to lose the money.
MR. WOLFE: That may be so, but nonetheless, their clients have been paid.
There was no testimony relating to the nature of the Abandoned Mine Reclamation Fund payments received by the homeowners, but the implication is clear from the dialogue of counsel, that there was no controversy with respect to the purposes for which these federal funds were disbursed. In addition, there seems to be no dispute that, in many instances, the Federal Housing Administration and the Veterans Administration forgave the mortgage indebtedness on the homeowners' several properties.
As a threshold matter, we consider the status of the County as a tortfeasor. Prior to instituting the state case, the homeowners brought an action against Campbell *1112 County in the United States District Court for the District of Wyoming. Miller v. Campbell County, 722 F.Supp. 687 (D.Wyo. 1989). In that action, they asserted they had been deprived by the County of constitutional rights, including property and liberty interests, without due process of law. That action was dismissed in favor of a state inverse condemnation action, and the dismissal was affirmed. Miller v. Campbell County, 945 F.2d 348 (10th Cir.1991), cert. denied, 502 U.S. 1096, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1992).
In the federal case, the court stated:
The county is a person possessing the power of condemnation and would therefore be subject to an inverse condemnation action. Wyo.Stat. § 1-26-801 (1988). The court is compelled to conclude that the plaintiff has not been deprived of a federally secured property right because the defendants took his property during an emergency for which the state of Wyoming plainly provides an adequate post-deprivation remedy.
Miller v. Campbell County, 722 F.Supp. at 691-92 (emphasis added).
This is a clear allusion to the exercise of the police power and refutes any misconduct on the part of the County. The United States Court of Appeals for the Tenth Circuit stated:
The defendants' actions were reasonable and measured, with appropriate concern for the situation and the interests of all involved. We cannot say on this record that the defendants' actions were arbitrary, capricious and unreasonable.
Miller v. Campbell County, 945 F.2d at 354 (emphasis added).
In Miller I, 854 P.2d at 77-78, we said:
The circumstances of this case, despite what appellants would have us believe, do not warrant the allowance of emotional distress damages. The commissioners were faced with an emergency of immense proportions. Poisonous gases were seeping into Rawhide Village subdivision and into the residents' homes. In an attempt to protect the health of the residents the county removed these families from this dangerous situation. The commissioners believed that federal relief would be available to appellants if they evacuated the Rawhide Village subdivision. Although federal relief was not available until September 4, 1987, state money was. As a result of the commissioners' actions, the residents received money from the state, the Abandoned Mine Reclamation Fund and, eventually, the federal government. Regardless of the confusion that ensued during this time, the commissioners were acting in good faith to protect the residents of the Rawhide Village subdivision. (Emphasis added.)
Earlier, we distinguished the action from a tort case in disallowing recovery for emotional distress saying:
"Recovery of damages for negligence may not be had in a condemnation action." Coronado [Oil Company v. Grieves], 642 P.2d [423] at 438 [(Wyo.1982)]. The analogy to tort law used by appellants is clearly not applicable in this case.
* * * * * *
Emotional distress is not a proper element of damages in an inverse condemnation action.
Miller I, 854 P.2d at 77 (emphasis added).
We hold it is the law of this case that Campbell County is not a tortfeasor.
We turn then to the concept of the collateral source rule. A useful definition is captured in BLACK'S LAW DICTIONARY 262 (6th ed. 1990):
Collateral source rule. Under this rule, if an injured person receives compensation for his injuries from a source wholly independent of the tort-feasor, the payment should not be deducted from the damages which he would otherwise collect from the tort-feasor. Kirtland & Packard v. Superior Court for County of Los Angeles, 59 Cal.App.3d 140, 131 Cal.Rptr. 418, 421 [(1976)]. In other words, a defendant tortfeasor may not benefit from the fact that the plaintiff has received money from other sources as a result of the defendant's tort, e.g. sickness and health insurance. (Emphasis added.) *1113 See also Smith v. County of Los Angeles, 214 Cal.App.3d 266, 262 Cal.Rptr. 754 (1989); Helfend v. Southern California Rapid Transit Dist., 2 Cal.3d 1, 84 Cal.Rptr. 173, 465 P.2d 61 (1970). In Miller I, we acknowledged California as a source of our eminent domain law and, in eminent domain cases, California cases are afforded enhanced relevance.
As noted in the definition and the cited cases, the collateral source rule is invoked to inhibit a tortfeasor from receiving credit in an instance in which a plaintiff has received payments from his insurer or other sources for medical treatment or other losses, which ultimately are established to be the responsibility of the tortfeasor. In such instances, the underlying policy for application of the rule is that "a person who has invested years of insurance premiums * * * should receive the benefits of his thrift." Helfend, 465 P.2d at 66. The court further explained the policy rationale:
If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance.
Helfend, 465 P.2d at 66-67.
The policy justification includes payments from other sources than insurance (like pension or disability payments) and also extends to situations in which the collateral source would be entitled to subrogation or reimbursement. See Helfend, 465 P.2d at 69. See also Lewis v. County of Contra Costa, 130 Cal.App.2d 176, 278 P.2d 756 (1955).
In Wyoming, a counter policy argument has been espoused. The justification for this policy is that an injured plaintiff "is entitled to be compensated for his loss and no more," and double recoveries are not favored in the law. Hansen v. Sheridan County Sch. Dist. No. 2, 847 P.2d 1026, 1028 (Wyo.1993). See also UNC Teton Exploration Drilling, Inc. v. Peyton, 774 P.2d 584 (Wyo.1989); W. Nat'l Bank of Casper v. Harrison, 577 P.2d 635 (Wyo.1978). This may be actually consistent with the rule in California because, in Helfend, the court declined to expand the application of the collateral source rule, stating:
"Double recovery is justified only in the face of some exceptional, supervening reason, as in the case of accident or life insurance, where it is felt unjust that the tortfeasor should take advantage of the thrift and prescience of the victim in having paid the premiums."
Helfend, 465 P.2d at 67 (emphasis added).
No case has been cited by the parties, nor have we discovered any, in which the collateral source rule has been applied in favor of one seeking compensation for inverse condemnation. One of the cited California decisions, because California is acknowledged as a source of eminent domain law in Wyoming, has highly persuasive effect. The application of the collateral source rule was considered, and then rejected, in an action for inverse condemnation by invoking the proscription against double recovery or a windfall. Smith, 262 Cal.Rptr. 754.
In Smith, the home of one of the plaintiffs had to be demolished because of a landslide. Arguably, the landslide was caused in part by the county's construction of a road in the vicinity of the plaintiff's home. The court there affirmed an award of damages for emotional distress which was based upon the liability of the county for a dangerous condition on public property and nuisance theories invoking tort principles. The court also affirmed the reduction by the trial court of the plaintiff's damages because the mortgagee had canceled the outstanding indebtedness of $110,000 on the home. The court explained, with respect to compensation for inverse condemnation:
The owner of property taken or damaged by a public entity is entitled to just compensation. Although the usual measure of just compensation is the fair market value of the property taken, the award of damages should be sufficient to make the owner whole but not result in a windfall.

*1114 Forrest asserts that no windfall would have resulted had the trial court ignored the reconveyance and awarded him the full value of the destroyed property. The fact is, however, that prior to the landslide Forrest owned a house encumbered by a $110,000 loan evidenced by a trust deed. As a result of the landslide, this debt was forgiven and the trust deed reconveyed. If Forrest were awarded damages in the amount of the full market value of the residence, he would receive a windfall of $110,000 over the amount of the damage he sustained.
Smith, 262 Cal.Rptr. at 769 (emphasis added, citations omitted).
Addressing specifically the plaintiff's contention that the collateral source rule should be invoked and, thus, inhibit consideration or deduction of the $110,000 against his award of compensation, the court said: "The first flaw in Forrest's argument is that he cites no authority for the proposition that the collateral source rule applies in an action for inverse condemnation." Smith, 262 Cal.Rptr. at 769. The court also noted the mortgagee had canceled the debt without reserving any right of subrogation nor a claim for reimbursement, and the plaintiff had not paid anything for the forgiveness of the mortgage.
We hold the rationale in Smith is applicable to this case. The homeowners have cited no authority for invoking the collateral source rule in an action for inverse condemnation. The collateral source rule itself contemplates its application to a tortfeasor but, as we have noted, it is the law of this case that the County is not a tortfeasor.
The Wyoming Eminent Domain Act, WYO.STAT. §§ 1-26-501 to -817 (1988), and our cases interpreting those provisions require that these homeowners receive fair market value as just compensation for any property taken by the County or, for a partial taking, the greater of the property rights taken or the amount by which the fair market value of the property is diminished. WYO.STAT. § 1-26-702. See L.U. Sheep Co. v. Bd. of County Comm'rs of Hot Springs County, 790 P.2d 663 (Wyo.1990); Energy Transp. Systems, Inc. v. Mackey, 650 P.2d 1152 (Wyo.1982); Coronado Oil Co. v. Grieves, 642 P.2d 423 (Wyo.1982); State Highway Comm'n v. Scrivner, 641 P.2d 735 (Wyo.1982). In this instance, it is appropriate to emphasize the language of WYO.STAT. § 1-26-701(c):
Except as specifically provided by W.S. 1-26-701 through 1-26-713, compensation, damages, or other relief to which a person is otherwise entitled under this act or other law are not affected, but duplication of payment is not permitted. (Emphasis added.)
In Miller I, we ruled the same provisions govern condemnation and inverse condemnation cases.
In this regard, we are satisfied, at least in some instances, the Abandoned Mine Reclamation Fund payments were applied to mortgage reduction or the homeowners' equity in their homes. We adopt the definition of "equity" as found in BLACK'S LAW DICTIONARY 540 (6th ed. 1990):
Equity. * * *

Real estate. The remaining interest belonging to one who has pledged or mortgaged his property, or the surplus of value which may remain after the property has been disposed of for the satisfaction of liens. The amount or value of a property above the total liens or charges. The difference between the fair market value and debt in property; thus, an equity of $5,000 may come about by having fair market value property of $20,000 with debt of $15,000. (Emphasis added.)
In some cases, we also are persuaded mortgages were forgiven without any requirement for subrogation or reimbursement. These would constitute payments to satisfy the loss, in all or in part, that the homeowners suffered by any taking on the part of the County.
We hold the collateral source rule is not applicable in an inverse condemnation action, and these payments must be credited against any compensation award for the fair market value of the land taken or for the diminution in value of land partially taken. Otherwise, the homeowners would receive a double recovery, a "windfall."
*1115 The Order Granting Defendant's Motion for Partial Summary Judgment entered in the district court on May 9, 1994, dismissing those homeowners named in the Order from the lawsuit because they have been fully compensated, is affirmed in all respects. With respect to any remaining homeowners, the district court must use our rules for just compensation in determining the loss of each homeowner. The court then must reduce that amount by the amount of any Abandoned Mine Reclamation Fund monies received by the respective homeowners as compensation for the home, as well as any similar payments from any other funding sources received by any homeowner.
Affirmed.