**Darry A.. FERGUSON, Appellant (Defendant),**

v.

**CORONADO OIL COMPANY, a Colorado corporation, Appellee (Plaintiff).**

**CORONADO OIL COMPANY, a Colorado corporation, Appellant (Plaintiff),**

v.

**Darry A. FERGUSON, individually; Petrocarbon Energy Corporation, a Colorado corporation, for itself and as successor-by-merger to Pioneer Engineering Corporation, a Colorado corporation; Pioneer Engineering Corporation, formerly known as Engineering Operators, Inc., a Colorado corporation, Appellees (Defendants).**

Nos. 93–164, 93–165.

Supreme Court of Wyoming.

Nov. 14, 1994.

Tim Newcomb of Grant & Newcomb, Cheyenne, and Dana L. Eismeier of Burns,

Figa & Will, Englewood, CO, for Darry A. Ferguson.

David D. Uchner, Cheyenne, and Peter A. Bjork and Gregory R. Danielson of Bjork, Seavy, Lindley & Danielson, Denver, CO, for Coronado.

Before GOLDEN, C.J., and THOMAS, CARDINE *, MACY and TAYLOR, JJ.

CARDINE, Justice, Retired.

These consolidated appeals are the result of a dispute between an operator of an oil field and a non-operator net profits interest owner. Darry A. Ferguson (Ferguson) appeals a jury verdict resulting in an award of $611,138.00 for conversion of Coronado Oil Company's (Coronado) net profits and $600,-000.00 in exemplary damages. Ferguson challenges the appropriateness of an action for conversion in the context of a net profits agreement. Ferguson also asserts that the damages award should be reduced because of Coronado's failure to comply with a provision of the agreement. Coronado cross-appeals claiming that the district court failed to apply the correct interest rate to the damages award.

We affirm in part, reverse in part and remand.

In his appeal, No. 93–164, Ferguson frames the issues for review as follows:

> Issue I: Conversion claim cannot lie because Coronado has no interest in the subject of conversion.

> Issue II: Damages limited by Coronado's failure to provide written exceptions as required by agreement.

Coronado raises two issues in its appeal, No. 93–165:

1. Whether the Trial Court erred in dismissing the Plaintiff's and Cross–Appellant's fraud claim against the Defendants;

2. Whether the Trial Court erred in holding that Wyoming Statute §§ 30–5–301 to 305 (1992 Cum.Supp.) does not apply to the net profits interest owned by Coronado.

* Retired July 6, 1994.

### FACTS

In the mid 1950s, Coronado began to explore the possibility of utilizing waterflood operations to exploit the Osage oil field (the field) near Newcastle, Wyoming. Experimental projects indicated that the field was conducive to such operations. At the time, however, Coronado did not have the financial resources to fully capitalize on the field's potential. So Coronado sought an alliance with a company which did have the financial capability.

On July 23, 1968, Coronado entered into an agreement with Buttes Gas and Oil Company (Buttes). Coronado conveyed all of its interests in the underlying leases to Buttes while retaining a 50 percent, later reduced to 47.5 percent, interest in the net profits of any oil produced. In return, Buttes was to be the operator of the waterflood project. Buttes was to remit on a monthly basis the net profits, if any, to Coronado, determined in accordance with the accounting practices promulgated by the Council of Petroleum Accountants Societies of North America, which was an addendum to the agreement. Buttes was allowed to deduct certain expenses from the oil proceeds, limited to its actual costs. Buttes was not supposed to make any profit by virtue of the fact that it was the operator; profits were to be derived solely from the actual production of oil.

The agreement contains two other provisions which are relevant. First, Coronado retained the right to audit the operator's books to ensure that all expenses charged were legitimate. Second, Coronado had to make a written exception to any monthly statement from the operator within 24 months after the end of the calendar year in which the statement was received or the statement was presumed correct.

In 1980, Buttes sold its interest to Petro Lewis Oil Corporation (Petro Lewis). Petro Lewis ran the operation until 1985 when Petrocarbon Energy (Petrocarbon) bought its interest. Under Buttes and Petro Lewis's operation, Coronado received payments of net profits for 168 consecutive months.

At the time Petrocarbon purchased the Osage field operations, Ferguson was the president, treasurer, a director and owned 95 percent of the stock of the company. Petrocarbon contracted with Pioneer Engineering Corporation (Pioneer) to do the actual field operations. Pioneer was subsequently merged into Petrocarbon. A new corporation, Engineering Operators, Inc., was formed, and it took over Pioneer's field operations. Later, Engineering Operators was renamed Pioneer Engineering Corporation. For the sake of simplicity, we will refer to these entities collectively as "Pioneer." Ferguson owned 100 percent of Pioneer's stock.

Coronado received net profits payments for the first three months of Petrocarbon's operation. Coronado never received another payment. The operating expenses charged by Petrocarbon increased dramatically at that time. For example, Petrocarbon's expenses for the first fourteen months of operations averaged $85,503.05 per month while Petro Lewis, during the last eleven months of its operation, averaged $60,000.00 per month. The result was a net loss which, according to the terms of the agreement, was carried on to the next month. Through 1988 the cumulative net loss was over $300,000.

Coronado unsuccessfully attempted to alleviate its concerns about the expenses being charged. As required by the agreement, Coronado took written exceptions to the charges of November and December of 1985. Coronado also requested an audit of Petrocarbon's and Pioneer's books. Ferguson refused to allow an audit of Pioneer's books because, he claimed, Pioneer was a separate company, not subject to the provisions of the agreement.

An audit was conducted by Maupin & Associates (Maupin) in February of 1990. Maupin was allowed access only to Petrocarbon's books and only for 1988 and 1989. Maupin found numerous financial irregularities which led it to conclude that Petrocarbon had used its related entity, Pioneer, to circumvent the requirement of charging only costs. Maupin also concluded that Petrocarbon had double charged expenses and had included expenses which were not properly chargeable. It was also discovered that Petrocarbon did not repay Pioneer for expenses charged to Petro-

carbon although the expenses were being passed on to Coronado.

Later, during the discovery process, Maupin was able to audit Pioneer's books which permitted a precise calculation of Petrocarbon's overcharges. The final tally was a total of $2,194,292 in overcharges by Petrocarbon. Maupin recalculated the monthly net profits and concluded that Petrocarbon should have remitted to Coronado $508,000 as of June 1991.

In September of 1990, Coronado filed this action against Ferguson, Petrocarbon and Pioneer in the District Court for Weston County, Wyoming. In its second amended complaint, Coronado made claims for relief based on breach of contract, breach of fiduciary duty, negligence, fraud, conversion and alter ego liability. Coronado also requested an accounting, appointment of a receiver and imposition of a constructive trust. Coronado's claims on breach of fiduciary duty, negligence and fraud were ultimately dismissed by the court.

Pioneer failed to appear, and default was entered against it. After trial, a jury returned a verdict against Ferguson and Petrocarbon. The jury found that Petrocarbon and Pioneer were acting as the alter egos of Ferguson. The jury awarded damages of $611,138 on the conversion claim and $600,000 for exemplary damages. The judge then awarded Coronado $107,891.34 in interest. Based on the alter ego finding, Petrocarbon, Pioneer and Ferguson are jointly and severally liable for all damages. Only Ferguson has chosen to appeal to this court. Coronado appeals the adequacy of the interest award.

## ISSUES

### A. Ferguson's Appeal

#### 1. Conversion

Ferguson makes two arguments which are directed at the appropriateness of a conversion action under these circumstances. First, Ferguson argues that a net profits interest is not a property interest but contractual in nature. Since only property can be converted, Ferguson concludes that Coronado's interest was not susceptible of being converted. Second, Ferguson argues money cannot be converted unless it is in a form which is tangible, identifiable and segregated. Ferguson maintains that the money due Coronado under the net profits agreement fails to meet that criteria.

"Conversion is defined as any distinct act by dominion wrongfully executed over one's property in denial of his right or inconsistent with it." *Western Nat'l Bank of Casper v. Harrison,* 577 P.2d 635, 640 (Wyo. 1978). Essentially, conversion occurs when a person treats another's property as his own, denying the true owner the benefits and rights of ownership. *Frost v. Eggeman,* 638 P.2d 141, 144 (Wyo.1981). To establish a cause of action in conversion a plaintiff must show that:

> (1) he had legal title to the converted property; (2) he either had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff his rights to use and enjoy the property; (4) in those cases where the defendant lawfully, or at least without fault, obtained possession of the property, the plaintiff made some demand for the property's return which the defendant refused; and (5) the plaintiff has suffered damage by the loss of the property.

*Frost,* at 144; *see also De Clark v. Bell,* 10 Wyo. 1, 7, 65 P. 852, 853 (1901). Only personal property (chattel) can be converted. *Restatement, Second, of Torts* § 222A (1965); *see* H.D. Warren, Annotation, *Nature of property or rights other than tangible chattels which may be subject of conversion,* 44 A.L.R.2d 927, 936 (1955); *De Clark.*

We address Ferguson's contention that a net profits interest is not a property interest first, since, if Ferguson is correct, Coronado's interest could not have been converted in the first place. In *Young v. Young,* 709 P.2d 1254 (Wyo.1985), we held that oil and gas royalties, which are wrongfully withheld, may be recovered through a conversion action. We noted that after oil and gas has been brought to the surface it becomes personal property and therefore the plaintiff

had a property right in the severed oil and gas and to royalties, arising out of the proceeds from their sale, paid as a money equivalent of the property interest.

*Young,* at 1257. Ferguson attempts to distinguish *Young* by pointing out the difference between a royalty interest and a net profits interest. Ferguson argues that a royalty interest is a property interest because the owner of the interest has the option of taking his royalty in kind, thus giving him a possessory right in the oil and gas itself, which, as personal property, is subject to conversion. A net profits interest is not a property interest, Ferguson argues, because it is an interest in money due under a contract; it does not give the interest holder any right to take oil or gas in kind. Since a net profits interest is not a property interest, Ferguson theorizes that it cannot be converted.

■ Unfortunately, the law in regard to net profits interests is not well developed. A leading treatise describes it thusly:

[T]here is not a large body of law clearly defining the net profits interest, its nature, and its incidents. The only thing that can be said with any assurance is that a net profits interest may or may not be an interest in land and that the nature of the interest and the rights of its owner must be determined from the provisions of the instrument which created it.

\* \* \* \* \* \*

Regarding the nature of the interest that might be created, there are at least four [sic] realistic possibilities: (1) it can be a contractual right that is personal to the parties, (2) it can be a covenant running with the land or with a lease, (3) it can be a charge on the land, (4) it can create a lease or a sublease, or (5) it can be a separately identifiable property interest with its own recognized incidents.

5 Kuntz, *Oil and Gas,* § 63.5 (1991). While the cases focus on the specific agreement at issue, two general considerations can be stated: (1) a net profits interest in an oil and gas lease has no independent meaning, and (2) its nature is determined from the instrument creating the interest. *Christy v. Petrol Re-*

*sources Corp.,* 102 N.M. 58, 691 P.2d 59, 62 (App.1984).

■ We now turn to the instrument which created Coronado's net profits interest. The agreement provides in relevant part:

3(a). Subject only to acceptance of title by Buttes as provided in Section 2 above, Coronado agrees to sell, convey, assign, transfer and set over to Buttes, and Buttes agrees to purchase and receive from Coronado for the consideration hereafter stated, all of the right, title, interest, claim and demand of Coronado in and under each of the Exhibit "A" Leases \* \* \*. The sale and transfer of its interests by Coronado to Buttes shall be subject to \* \* \* the reservation of net profits to Coronado hereafter provided[.]

\* \* \* \* \* \*

5. Coronado shall be entitled to except and reserve in its assignments of Exhibit "A" Leases under Section 3(a) above an interest equal to 50% of the net profits realized by Buttes from all operations on the Exhibit "A" Leases subsequent to the effective date and time hereafter set forth. Net profits shall be computed on the basis of the gross proceeds of oil, gas, casinghead gas and other hydrocarbons produced, saved and sold from the Exhibit "A" Leases[.]

Initially, we can conclude that the interest reserved by Coronado is not a mineral interest which is an interest in real property. *Picard v. Richards,* 366 P.2d 119, 123 (Wyo. 1961). Oil and gas is real property while it remains in the ground. *State ex rel. Sch. Dist. No. 1 v. Snyder,* 29 Wyo. 163, 187, 212 P. 758, 762 (1923). Nothing in the agreement purports or can be read to give Coronado title to the minerals while they are *in situs* or the right to bonus and delay rentals, the traditional indicia of a mineral interest. *Picard,* at 123.

Having eliminated one possibility, we are left with two others: the interest may be contractual in nature or a personal property right. We conclude that the interest reserved by Coronado in the agreement is akin

to a separate identifiable personal property right.

Coronado's net profit interest entitles it to a share of the proceeds from production in the oil and gas field. That interest is similar to a non-participating royalty interest. *See generally* 1 Kuntz, *Oil and Gas,* § 16.2 (1987). A non-participating royalty is a right to or an interest in oil and gas only after it has been removed from the ground. *Id.* Instruments using the phrase "oil and gas produced and saved" have been construed as creating a royalty interest. *Id.* Coronado's interest also gives it the right to share in the proceeds of the oil and gas only after it has been removed. Further, the instrument creating that interest uses the phrase "hydrocarbons produced, saved and sold," which is similar to the language used to create a non-participating royalty. *Id.* Coronado's net profits interest is analogous to a non-participating royalty interest. *See Kumberg v. Kumberg,* 232 Kan. 692, 659 P.2d 823, 830 (1983) (net profits interests are in the nature of "royalty interests" constituting personal property); *T–Vestco Litt–Vada v. Lu–Cal One Oil Co.,* 651 S.W.2d 284, 295 (Tex.App.1983) (a "net profits reversionary interest" created a royalty or a similar non-possessory interest in the mineral estate).

Having found that Coronado's interest is similar to a royalty interest, we must address a possible conflict in our prior cases before determining whether Coronado's interest is a personal property interest. As we have already discussed, in *Young* we concluded that the proceeds due an overriding royalty interest holder could be the subject of a conversion action. However, in *Dame v. Mileski,* 80 Wyo. 156, 170, 340 P.2d 205, 208 (1959), which was not cited in *Young,* we held that an overriding royalty interest was an interest in real property and the plaintiff could thus maintain an action to quiet title. Since real property cannot be converted, these cases seemingly conflict. *See also Torgeson v. Connelly,* 348 P.2d 63, 68 (Wyo.1959) (a royalty interest in a lease with an indefinite term of duration is an interest in real property); *Denver Joint Stock Land Bank v. Dixon,* 57 Wyo. 523, 539, 122 P.2d 842, 848 (1942) (same).

The cases can, however, be reconciled. *Torgeson, Dame* and *Denver Joint Stock* involved quiet title actions where the existence of the royalties was in dispute. Thus the dispute was over the ownership of proceeds from minerals which were still in the ground and real property. This case and *Young* involve the disposition of the proceeds due to the royalty (or net profits) owner after the oil and gas has been removed from the ground and sold. Once the oil and gas were removed, they became personal property. *Denver Joint Stock,* 57 Wyo. at 533, 122 P.2d at 845. In discussing the nature of a lessor's royalty interest, the Kansas court of appeals commented:

> The lessor reserves his rights to royalty out of the grant. His rights arise from his ownership of the real estate rather than the lease and are therefore interests in real estate until the oil and gas are captured. It follows then that future royalty (unaccrued royalty) is a part of the real estate of the lessor; it is uncaptured and of an undetermined amount or location. Present royalty (accrued royalty) on the other hand, is captured and severed from the realty; it is personal property.

*Matter of Estate of Sellens,* 7 Kan.App.2d 48, 637 P.2d 483, 486 (1981); *see also United States v. Noble,* 237 U.S. 74, 80, 35 S.Ct. 532, 535, 59 L.Ed. 844 (1915) ("The rents and royalties were profit issuing out of the land. When they accrued, they became personal property; but rents and royalties to accrue were a part of the estate remaining in the lessor.").

We hold that Coronado's net profits interest is analogous to a royalty interest and since it has accrued, the interest is personal property. Contrary to Ferguson's contention, this was the key to the holding in *Young;* not that the royalty owner had a theoretical, but impractical, right to take the minerals in kind. In *Young* the plaintiff was seeking the monetary value of past royalties which were wrongfully withheld by the defendant. *Young,* at 1255–56. Coronado is seeking the same thing. *Young,* therefore, is dispositive; and Coronado's interest was susceptible to conversion by Ferguson.

Ferguson next argues that the money owed to Coronado under the agreement was not sufficiently identifiable, tangible or segregated to be subject to a conversion. That money may be the subject of a conversion action is an old and well established legal principle. *See* Annotation, 44 A.L.R.2d at 929 (citing cases). The money must be identifiable, though specific coins or bills do not have to be identified. 89 C.J.S. *Trover & Conversion* § 23 (1955); 7 Stuart M. Speiser et al., *The American Law of Torts* § 24:6 (1990); *Estate of Jackson v. Phillips Petroleum Co.*, 676 F.Supp. 1142, 1146 (S.D.Ala.1987). There must also be an obligation to deliver that money in a specific manner. *Richardson's Restaurants, Inc. v. Nat'l Bank of South Carolina*, 304 S.C. 289, 403 S.E.2d 669, 672 (App.1991); *Intermarkets U.S.A., Inc. v. C–E Natco*, 749 S.W.2d 603, 604 (Tex.App.1988); *Autoville, Inc. v. Friedman*, 20 Ariz.App. 89, 91, 510 P.2d 400, 402 (1973).

Once again, we find *Young* to be dispositive. Like the wife in that case, Coronado was entitled to a percentage of the oil and gas produced on the property. Coronado was entitled to that money each month. The precise amount owed to Coronado was easily determinable at the time it was due. Ferguson wrongfully retained that money and converted it to his own use through his elaborate accounting scheme. An oil and gas royalty is amenable to an action in conversion when it accrues and is then wrongfully retained. *Young*, at 1257–58. At the moment of accrual, the amount owed to the interest holder is identifiable with a concomitant obligation on behalf of the non-interest holder to pay the amount in the manner specified in the agreement. *See* W.S. 30–5–301(a).

Since we have already determined that Coronado's interest is identical to a royalty, it follows that its interest was just as capable of conversion. The district court did not err in allowing Coronado to bring an action in conversion.

### 2. Contract Defense

The agreement required Coronado to take a written exception to any monthly statement within 24 months after the end of the calendar year in which the statement was received or the statement was presumed correct. Ferguson argues that Coronado failed to take a written exception for the months between January 1986 and December 1988. Therefore, Ferguson contends, the statements were presumed correct and Coronado should not be able to obtain damages for those months.

Both parties vigorously contest whether Coronado did indeed comply with the exception requirement. We need not, however, decide that question because we conclude that the contract defense is unavailable to defeat an action in tort.

> Where the transaction complained of has its origin in a contract which places the parties in such a relation that in attempting to perform the promised service the tort was committed, the breach of contract is not the gravamen of the action. The contract in such case is mere inducement, creating the state of things which furnishes the occasion of the tort, and in all such cases the remedy is an action *ex delicto,* and not an action *ex contractu.*

*Schneider Nat'l, Inc. v. Holland Hitch Co.,* 843 P.2d 561, 586 (Wyo.1992) (*quoting* 17A Am.Jur.2d *Contracts* § 732 (1991)). Coronado's action was in tort, not contract. The exceptions clause in the contract is unavailable to defeat or mitigate Coronado's damages arising out of the tort committed by Ferguson.

### B. Coronado's Appeal

Coronado raises two issues on appeal. The first is whether the district court erred in dismissing Coronado's fraud claim. We need not address this issue since we have upheld the jury award based on conversion.

The second issue is whether the district court erred by not applying the statutory interest rate of 18 percent. Coronado argues that W.S. 30–5–301 to –305 are applicable to the net profits interest entitling it to an interest rate of 18 percent on the unpaid proceeds. We agree and reverse and remand for a recalculation of the appropriate interest.

The Royalty Payment Act [W.S. 30–5–301 to –305] is a remedial statute intended "to stop oil producers from retaining other people's money for their own use." [*Independent Producers Marketing Corp. v.] Cobb,* 721 P.2d [1106,] 1110 [ (Wyo.1986) ]. * * * Equity is not a factor for consideration because there are no exceptions in the Act providing justification for royalty nonpayment.

*Cities Serv. Oil & Gas Corp. v. State,* 838 P.2d 146, 156 (Wyo.1992). The Act is to be liberally construed to effectuate its remedial purpose. *Moncrief v. Harvey,* 816 P.2d 97, 105 (Wyo.1991).

The relevant portions of the Act provide: *The proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in the state of Wyoming shall be paid to all persons legally entitled thereto,* except as hereinafter provided, commencing not later than six (6) months after the first day of the month following the date of first sale and thereafter not later than sixty (60) days after the end of the calendar month within which subsequent production is sold, unless other periods or arrangements for the first and subsequent payments are provided for in a valid contract with the person or persons entitled to such proceeds. *Payment shall be made directly to the person or persons entitled thereto by the lessee or operator or by any party who assumes such payment obligation under any legal arrangement.*

W.S. 30–5–301(a) (1983) (emphasis added). Any lessee or operator, purchaser or other party legally responsible for payment who violates the provisions of this article is liable to the person or persons legally entitled to proceeds from production for the unpaid amount of such proceeds, plus interest at the rate of eighteen percent (18%) per annum on the unpaid principal balance from the due date specified in W.S. 30–5–301(a).

W.S. 30–5–303(a) (1994 Cum.Supp.).

The statute unambiguously requires the party who has the legal obligation to pay any proceeds from the production of an oil or gas well to make the payments in accordance with either the time set out in the statute or within a time frame established by a legal agreement between the parties. Failure to do so results in liability for the amount of the unpaid proceeds plus 18 percent per annum interest. There are no exceptions. *Cities Serv.,* at 156.

The net profits owed to Coronado are "proceeds derived from the sale of production from any well producing oil * * *." W.S. 30–5–301(a). The agreement provided that the net profits were to be "computed on the basis of the gross proceeds of oil * * * produced, saved and sold from * * *" the field. Ferguson did not remit Coronado's share of the proceeds as required; the statute mandates an interest rate of 18 percent on the delinquent amount.

### CONCLUSION

The net profits interest owned by Coronado was personal property that was converted by Ferguson. Since conversion is an action in tort, Ferguson could not rely upon a defense in contract to defeat or limit Coronado's damages. Finally, Ferguson is liable for 18 percent interest on the proceeds he failed to pay Coronado.

Affirmed in part, reversed in part and remanded for the recalculation of damages based on the 18 percent interest rate.