ANR PRODUCTION COMPANY,
a Delaware Corporation,
Appellant (Defendant),

v.

KERR–McGEE CORPORATION, as Successor to Argent Energy, Inc., formerly known as Woods Petroleum Corporation, a Delaware Corporation, Appellee (Plaintiff).

KERR–McGEE CORPORATION, as Successor to Argent Energy, Inc., formerly known as Woods Petroleum Corporation, a Delaware Corporation, Appellant (Plaintiff),

v.

ANR PRODUCTION COMPANY,
a Delaware Corporation,
Appellee (Defendant).

Nos. 94–167, 94–168.

Supreme Court of Wyoming.

April 4, 1995.

W. Perry Dray, William J. Thomson, and Brandin Hay of Dray, Madison & Thomson, P.C., Cheyenne, and Michael S. Yauch, Houston, TX, for ANR Production Co.

Morris R. Massey of Brown & Drew, and Craig Newman, Casper, for Kerr–McGee Corp.

Before GOLDEN, C.J., THOMAS, MACY and LEHMAN, JJ., and GRANT, District Judge.

MACY, Justice.

ANR Production Company and Kerr–McGee Corporation each appeal from the order in which the district court entered a judgment against ANR Production and in favor of Kerr–McGee but denied Kerr–McGee's request for an award of interest at the rate of eighteen percent per annum on the judgment and attorneys' fees pursuant to WYO.STAT. §§ 30–5–301 to –303 (1983 & Supp.1994) (the Act).

We affirm the district court's judgment in all respects.

### Issues

ANR Production, as the appellant in Case No. 94–167, presents two issues:

I. Are the trial court's findings of fact with respect to volumes of First Bench hydrocarbons produced by Appellant ANR Production Company's South Powell 2–1 well, and hence the trial court's findings of fact with respect to the damages suffered by Appellee Kerr–McGee Corporation, supported by sufficient evidence in the record?

II. Was Kerr–McGee's damages claim unliquidated, such that the trial court's conclusions of law with respect to prejudgment interest were in error?

Kerr–McGee, as the appellant in Case No. 94–168, presents a single issue:

Whether Kerr–McGee Corporation, as the prevailing party in this action to recover proceeds derived from the sale of First Bench hydrocarbons, is entitled to recover interest and reasonable attorneys' fees pursuant to W.S. §§ 30–5–301 et seq. ...?

### Facts

The Wyoming Oil and Gas Conservation Commission (the Commission) gave approval in 1983 for the formation of the Powell Pressure Maintenance Unit (the Unit). The Unit produces hydrocarbons from the First Bench of the First Frontier Formation in Converse County. In the area of the Unit, the First Bench is an excellent hydrocarbon reservoir; however, because of the retrograde condensate nature of the reservoir, its pressure must be maintained above a critical pressure which is known as the dew point. As hydrocarbons are produced from the reservoir, the pressure decreases. If the pressure were to decline below the dew point, producible hydrocarbons would be irretrievably lost. The Unit was formed in order to allow the owners of the oil and gas leaseholds and other inter-

ests, through the Unit's designated operator, to inject gas into the First Bench to maintain the pressure above the dew point.

Woods Petroleum Corporation was designated as the original operator of the Unit. ANR Production was one of the nonoperating working interest owners of the Unit and, accordingly, executed the Unit Agreement and the Unit Operating Agreement. Pursuant to those agreements, only the Unit's operator was authorized to conduct operations on behalf of the Unit in the unitized area of the First Bench.

The agreements provided, however, that individual oil and gas lessees could obtain permission to explore and develop zones other than the First Bench which were located within the same geographical area as the Unit. The Second Bench of the First Frontier Formation is a potentially productive zone which is found approximately forty to fifty feet below the First Bench within the surface boundaries of the Unit. The Second Bench is geologically distinct from the First Bench. In the area of the Unit, the Second Bench is a low quality hydrocarbon reservoir, and Second Bench wells must be completed by using hydraulic fracture treatments in order to artificially stimulate their production.

In September 1986, ANR Production requested permission from Woods Petroleum to drill and complete the South Powell Federal No. 2–1 well (the South Powell well) in order to test the Second Bench within the surface boundaries of the Unit. ANR Production had previously completed the Alford Federal well and the Bozeman Trail well in the Second Bench in the general area of the Unit. In the letter in which it requested permission to drill the South Powell well, ANR Production represented that it would complete that well in the same manner as it had completed the Alford Federal well.

The members of the Unit approved ANR Production's request. ANR Production drilled the South Powell well in November 1986 and hydraulic fracture treated it in December 1986. ANR Production used a different material to prop the fractures open in the South Powell well than it had used in the Alford Federal well. The South Powell well

commenced sustained commercial production in March 1987.

In June 1988, after it had conducted tests and reviewed data which indicated that the South Powell well was producing significantly more hydrocarbons than other Second Bench wells, Woods Petroleum concluded that the South Powell well was in communication with and producing oil and gas from the unitized First Bench. Woods Petroleum informed ANR Production of its conclusion and requested that ANR Production shut-in the production from the well. ANR Production refused.

Woods Petroleum presented an application to the Commission, requesting that the Commission order the South Powell well to be shut-in if the Commission determined that communication existed. After several months of consideration, the Commission concluded that ANR Production's fracture treatment of the South Powell well had caused substantial communication between the First Bench and the Second Bench and that hydrocarbons were being drained from the First Bench to the Second Bench through the perforations in the South Powell well. In March 1989, the Commission ordered ANR Production to shut-in the production from the South Powell well. This Court affirmed the Commission's decision to shut-in the South Powell well in *ANR Production Company v. Wyoming Oil and Gas Conservation Commission*, 800 P.2d 492 (Wyo. 1990).

On November 6, 1990, the Unit's operator, Argent Energy, Inc., which was formerly known as Woods Petroleum, filed a lawsuit against ANR Production. When Kerr–McGee succeeded Argent Energy as the operator of the Unit, it was substituted as the party plaintiff in the case. In its first amended complaint, Kerr–McGee pleaded six claims for relief: (1) conversion of hydrocarbons, (2) trespass, (3) breach of contract, (4) a claim for interest and attorneys' fees under the Act, (5) punitive damages, and (6) strict liability. ANR Production filed counterclaims against Kerr–McGee which included claims for (1) breach of contract, (2) conversion of hydrocarbons and mineral trespass,

and (3) interest and attorneys' fees pursuant to the Act.

The district court held a bench trial in June 1993. During the trial, the district court dismissed Kerr–McGee's strict liability claim. At the conclusion of the trial, the district court issued its findings of fact and conclusions of law in a decision letter. The district court generally concluded that ANR Production had trespassed against Kerr–McGee and had converted First Bench hydrocarbons which belonged to the Unit to its own use. The district court determined that ANR Production had breached its contractual obligations to the Unit, and it also held that the Act did not apply under the circumstances of this case. The district court decided that Kerr–McGee was not entitled to receive an award of punitive damages and denied ANR Production's counterclaim. Specifically, the district court found that ANR Production had converted 132,357 barrels of oil and 932,756 million standard cubic feet of gas from the Unit, and it granted a judgment in favor of Kerr–McGee in the amount of $6,038,075.02. After the district court denied ANR Production's post-trial motions, both parties appealed to this Court.

### Damages

■ ANR Production contends that the district court's findings of fact as to the volume of First Bench hydrocarbons produced by the South Powell well were not supported by the evidence in the record. ANR Production maintains, therefore, that Kerr–McGee did not meet its burden of proving its damages to a reasonable degree of certainty. We disagree.

In accordance with W.R.C.P. 52(a), this Court will not set aside a district court's findings of fact unless the findings are clearly erroneous. *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo. 1993). " 'A finding is "clearly erroneous" when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

Stated alternatively: "[A] determination that a finding is against the great weight of the evidence means a finding will be set aside even if supported by substantial evidence." *Id.* See also *Samuel v. Zwerin*, 868 P.2d 265, 267 (Wyo.1994). We review a district court's conclusions of law *de novo* on appeal. *Hopper*, 861 P.2d at 538.

*McNeiley v. Ayres Jewelry Co.*, 886 P.2d 595, 597 (Wyo.1994). We have also held: " 'Damages must be proven with a reasonable degree of certainty, and a court may not resort to speculation or conjecture in determining the proper amount to award.' " *Sannerud v. Brantz*, 879 P.2d 341, 345 (Wyo.1994) (quoting *Cottonwood Valley Ranch, Inc. v. Roberts*, 874 P.2d 897, 899 (Wyo.1994)).

ANR Production and Kerr–McGee each presented expert testimony at trial to quantify the amount of hydrocarbons which had been drained from the unitized First Bench by the South Powell well. Stephen Holditch, Ph.D., a petroleum engineer who testified as an expert witness on behalf of Kerr–McGee, used an "analogy" method to quantify the amount of hydrocarbons converted by ANR Production. Stephen Malkewicz, who was ANR Production's expert petroleum engineer, used a computer reservoir simulation model to determine the amount of converted hydrocarbons. The expert engineers reached different conclusions as to the amounts of hydrocarbons drained from the First Bench.

The district court generally found that the engineering evidence offered by Kerr–McGee was more credible and more persuasive than was the engineering evidence presented by ANR Production and, therefore, accepted Dr. Holditch's calculations as to the amounts of converted oil and gas. Dr. Holditch identified three Second Bench wells which were analogous to the South Powell well. Using the average monthly production of those three wells, Dr. Holditch employed a statistical analysis to estimate the amount of the South Powell well's monthly production which originated from the Second Bench. He then subtracted that amount from the South Powell well's total monthly production to determine the amount of First Bench hydrocarbons which ANR Production had con-

verted. In total, Dr. Holditch concluded that the South Powell well produced 132,357 barrels of oil and 932,756 million standard cubic feet of gas which rightfully belonged to the Unit.

Kerr–McGee established a sufficient foundation for Dr. Holditch's damages calculations. Dr. Holditch testified that experts in his field generally accepted the analogy method as being a procedure for quantifying production, and his testimony was consistent with the geologic and petrologic evidence presented by Kerr–McGee's other expert witnesses.

ANR Production insists that Dr. Holditch's conclusions as to the amount of hydrocarbons converted were scientifically inaccurate because they showed that the South Powell well produced First Bench hydrocarbons during every month that the well was in production. ANR Production contends that Dr. Holditch's conclusions were erroneous because he failed to take two factors into account: (1) the existence or nonexistence of a negative pressure differential in the first month [1] of production which would have allowed hydrocarbons to flow from the First Bench into the South Powell well's wellbore, and (2) the fact that the First Bench oil had been swept away from the South Powell well when the Unit's gas front passed through the area in the Spring of 1988. We note that the analogy methodology does not use the pressure differential factor or the gas front factor as a consideration in reaching conclusions about the quantity of produced hydrocarbons. Kerr–McGee emphasized in its oral argument that those factors are independent of the analogy method of quantification.

The evidence adduced at trial did not support ANR Production's contention that it was physically impossible for the South Powell well to produce First Bench hydrocarbons during its first month of production because the subterranean pressures in the Second Bench were higher than were those in the First Bench. Under the fundamental laws of physics, hydrocarbons move from higher pressure areas to lower pressure areas. Dr. Holditch observed, however, that, in determining whether hydrocarbons would flow from the First Bench through the fracture to the South Powell well's perforations, the relevant measurement was the difference between the flowing bottom hole pressure of the South Powell well and the pressure of the First Bench, not the difference between the average pressure in the Second Bench and the average pressure in the First Bench. Although no direct evidence was produced about the actual flowing bottom hole pressure of the South Powell well, Dr. Holditch testified that, "as soon as the well was fracture treated, the two benches were connected and [that,] as soon as the Second Bench started producing and the bottom-hole flowing pressure dropped below the [pressure in the First Bench]," the hydrocarbons would have begun to flow from the First Bench to the South Powell well.

ANR Production insists that the negative pressure differential which would have allowed hydrocarbons to flow from the First Bench to the South Powell well could not have come into existence immediately after the well was drilled. In support of its contention, ANR Production points to Dr. Holditch's testimony about the Alford Federal well which was also completed in the Second Bench and which was communicated to the First Bench by a fracture. Dr. Holditch testified:

Q. [BY MR. YAUCH]....

Do you have an opinion today as to whether the Alford Federal initially produced First Bench oil?

A. My opinion is it would have as soon as the pressure in the fracture and Second Bench dropped below the pressure in the First Bench. And I don't know what those pressures were, but as soon as that happened, First Bench oil would start being produced in that well.

1. ANR Production contends in its brief that the negative pressure differential could not have existed during the first few months of the South Powell well's production. During oral arguments, however, ANR Production limited its argument to the first month of production, contending that, if Kerr–McGee's proof of damages for the first month was insufficient, its entire claim must fail.

Q. But you don't know when or if that happened?

A. I don't know when it happened, but I would be very, very surprised if that flow in pressure in all those wells, because they're so poor, has not been pulled way down since that time and probably during the first few months, but I don't know. I haven't looked at those numbers.

ANR Production contends that Dr. Holditch's testimony

clearly demonstrates that there is a lag time between the initial production pressure of a Second Bench well in communication via a fracture with the First Bench and the existence of a pressure differential between the First Bench and the Second Bench which allows a Second Bench well to produce First Bench hydrocarbons.

ANR Production's argument fails to take into account Dr. Holditch's testimony about the Manning Flat well which was located very near the South Powell well and which was also initially communicated between the two benches:

Q. [BY MR. YAUCH].....

Let's talk about the initial period after it was initially completed and frac'd and before the cement squeeze job was undertaken. Was there communication between the First Bench and the Second Bench through that frac during that time frame?

A. Yes.

Q. And in what direction was that communication?

A. Well, the communication is in both directions. I mean you have two layers of rock connected by fracture so the communication can go either way.

Q. Okay. Which direction did it go in that initial period?

A. Talking about the communication or the flow rates—the flow within the fracture?

Q. The flow within the fracture. Thank you.

A. Well, it depends on what the pressure is at the perforations in the Second Bench. When they started [producing] the well and reducing the pressure at the perforations in the Second Bench, then oil will flow from the First Bench through the fracture to the Second Bench to the surface. If they shut the well in and pressure increases, then flow can go back the other way so it all depends upon the pressure differential.

Q. And at the time that the well was initially put on production, is it your testimony that the flow rate was from the First Bench to the Second Bench at the Manning Flat?

A. Yes.

Dr. Holditch's testimony makes it clear that it was, in fact, physically possible for a Second Bench well which had communicated with the First Bench to produce First Bench hydrocarbons from the outset of its production. Therefore, the record does not support ANR Production's pressure differential argument.

ANR Production also argues that the district court's findings of fact did not account for "the undisputed passage of a gas front through the First Bench at the South Powell [well] in early 1988. The passage of such a gas front makes First Bench oil production from [the] South Powell [well] impossible." The Unit injected gas into the First Bench in order to maintain the reservoir pressure above the dew point. The gas injection process created a gas front which moved through the reservoir from higher pressure areas to lower pressure areas. The gas front pushed oil in front of it toward producing wells. When the gas front reached a well, that well's gas-oil ratio increased dramatically. After the gas front hit a well, the well could "gas out," meaning that most of the oil had been pushed away from the well and that the well was producing mainly gas.

Dr. Holditch testified that the gas front arrived at the South Powell well sometime between January and April of 1988. ANR Production argues that, once the gas front passed the South Powell well in April to May 1988, the well could not have produced any more First Bench oil because all the oil would have been pushed away. Accordingly, ANR Production contends that the district court's finding that the South Powell well

produced First Bench oil after the gas front had passed was clearly erroneous.

The evidence produced at trial does not support ANR Production's conclusion. Dr. Holditch testified:

> There is no sharp, clear [gas] front. The front will have some distance to it. So I say the—there is a difference between when the front arrived, which is the leading edge of the front, and when a well has been gassed out, which means all of the oil had been pushed out. There is a distinction there.

The record shows that not all wells gas out after the passage of the gas front. Dr. Holditch stated: "[T]he concept that[,] when the front goes through a well, the well gases out and the oil flow rates go to zero is not a valid concept." Dr. Holditch testified that a number of wells in the Unit continued to produce large quantities of First Bench oil after the gas front had passed through their area. Therefore, contrary to ANR Production's assertion, it was still possible for the South Powell well to produce First Bench oil after the gas front passed.

The district court properly considered the pressure differential and the gas front factors and correctly decided to accept Dr. Holditch's volume calculations. The district court's findings of fact were not clearly erroneous, and Kerr–McGee proved its damages to a reasonable degree of certainty.

### Prejudgment Interest

■ ANR Production argues that the district court erred by granting a prejudgment interest award to Kerr–McGee because Kerr–McGee's claim for damages was unliquidated. We disagree. Kerr–McGee was entitled to be awarded interest as an element of its damages which resulted from ANR Production's conversion of its hydrocarbons regardless of whether the damages claim was liquidated.

■ ANR Production is correct when it argues that, generally, true interest is recoverable by the prevailing party on only liquidated claims. " 'Prejudgment interest is recoverable in Wyoming on liquidated claims but not on unliquidated claims, with a liquidated claim being defined as one that is readily computable by basic mathematical calculation.' " *Dunn v. Rescon Technology Corp.*, 884 P.2d 965, 968 (Wyo.1994) (quoting *O's Gold Seed Company v. United Agri–Products Financial Services, Inc.*, 761 P.2d 673, 677 (Wyo.1988)).

■ In conversion cases, however, the equivalent of interest on the value of converted property is recoverable as an element of damages. The Wyoming Supreme Court specifically ruled on this issue in *Alanko v. Wayman (Estate & Guardianship of Johnson)*, 78 Wyo. 173, 320 P.2d 429 (1958). In that case, we held that the allowance of interest in a conversion case is not interest per se but is an additional amount of damages which the finder of fact may, in its discretion, award to compensate the plaintiff for the time between the origin of the cause of action (i.e., the conversion) and the trial. 78 Wyo. at 187, 320 P.2d 429. The purpose of this rule was articulated in 18 Am.Jur.2d *Conversion* § 121 at 233 (1985) (emphasis added):

> In actions for conversion it is generally recognized that interest, or the equivalent of interest, on the value of the property converted, may be recovered. While interest has usually been accepted as a proper measure of damages to be added to the value of the property from the date of conversion to the date of trial, *the purpose of the award is to compensate the plaintiff for the loss sustained because of the taking of property.*

Similarly, in *Reposa v. Buhler*, 770 P.2d 235 (Wyo.1989), this Court adopted the Restatement (Second) of Torts § 927 (1979) which established that interest may be recovered as an element of damages in cases which involve the tortious conversion or destruction of a chattel. 770 P.2d at 237. *See also* Restatement (Second) of Torts, *supra* at § 913(1)(a) cmt. (a).

■ ANR Production maintains that our decision in *O's Gold Seed Company* requires that the damages claim be liquidated in order for interest to be awarded to the prevailing party in a conversion case. *O's Gold Seed Company* cannot, however, be interpreted as

broadly as ANR Production proposes. *O's Gold Seed Company* was a conversion case in which an interest award was allowed. One of the issues on appeal was whether the correct interest rate had been used in computing the amount of the judgment. The district court found that the claim was liquidated. The parties did not contest that finding on appeal; accordingly, we cited the general rule that prejudgment interest is recoverable in Wyoming on liquidated claims. 761 P.2d at 677. The Court did not discuss in that case whether prejudgment interest may be available in conversion cases as an element of damages. Our decision in *O's Gold Seed Company*, therefore, does not state that a claim must be liquidated in order for a party to recover prejudgment interest in a conversion case. In accordance with *Alanko* and *Reposa*, we hold that the finder of fact may, in its discretion, award interest as an element of damages in a conversion case regardless of whether the claim is liquidated or unliquidated. The district court did not err in awarding prejudgment interest at the rate of seven percent per annum to Kerr–McGee on its conversion claim.

### Penalty Interest and Attorneys' Fees

■ Kerr–McGee contends that pursuant to the Act it is entitled to be awarded interest at the rate of eighteen percent per annum on its damages plus attorneys' fees. The district court held that the Act did not apply in this case. We agree.

The material provisions of the Act are presented at §§ 30–5–301(a) and 30–5–303(a) and (b). Section 30–5–301(a) provides in pertinent part:

(a) The proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in the state of Wyoming shall be paid to all persons legally entitled thereto, except as hereinafter provided....

Section 30–5–303(a) and (b) provides in pertinent part:

(a) Any lessee or operator, purchaser or other party legally responsible for payment who violates the provisions of this article is liable to the person or persons legally entitled to proceeds from production for the unpaid amount of such proceeds, plus interest at the rate of eighteen percent (18%) per annum on the unpaid principal balance....

(b) The district court for the county in which a well producing oil, gas or related hydrocarbons is located has jurisdiction over all proceedings brought pursuant to this article and the prevailing party in any proceedings brought pursuant to this article shall be entitled to recover all court costs and reasonable attorney's fees.

■ Applying our well-known rules of statutory interpretation, we hold that the Legislature's intent, as expressed in the plain language of the statutory provisions, was to limit the application of the Act to cases where a preexisting legal obligation for payment of the proceeds of the sale of hydrocarbons exists. *See, e.g., Halpern v. Wheeldon*, 890 P.2d 562, 564–65 (Wyo.1995) (reciting the rules for statutory interpretation). The Legislature expressly stated that the proceeds shall be paid to "all persons legally entitled thereto" by any party "legally responsible for payment." §§ 30–5–301(a), –303(a). The Legislature's repeated use of the term "legally" indicates that the Act was intended to apply only in cases where the parties had a prior legal relationship.

The Act presupposes that the party who was responsible for the payment had a right and an obligation to sell the hydrocarbons for the party who was legally entitled to receive the proceeds. Section 30–5–301(a) states that the "proceeds derived from the sale" of the hydrocarbons shall be paid over to the legally entitled party. The deadline for the payment of the proceeds hinges upon the date of the sale of the production.

This interpretation is consistent with our earlier decisions in which we applied the Act. In each of our prior decisions, the parties had a preexisting legal relationship for the sale of the hydrocarbons. *Ferguson v. Coronado Oil Company*, 884 P.2d 971 (Wyo.1994) (contractual interest in the net profits); *Cities Service Oil and Gas Corporation v. State*, 838 P.2d 146 (Wyo.1992) (royalties); *Moncrief v. Harvey*, 816 P.2d 97 (Wyo.1991) (royalties); *State v. BHP Petroleum Company*,

*Inc.,* 804 P.2d 671 (Wyo.1991) (royalties); *Independent Producers Marketing Corp. v. Cobb,* 721 P.2d 1106 (Wyo.1986) (royalties).

In this case, ANR Production and Kerr-McGee had no prior relationship which would have entitled ANR Production to produce or sell unitized First Bench hydrocarbons. Indeed, ANR Production's lack of authority to take the Unit's oil and gas was one of the primary issues at trial. Kerr-McGee was actually entitled to have the hydrocarbons themselves, not just the proceeds. Since the parties did not have a preexisting legal relationship, the district court correctly ruled that ANR Production was not liable to Kerr-McGee for the eighteen percent penalty interest or attorneys' fees under the Act.

### Conclusion

The district court did an admirable job of conducting and deciding this very complex case and did not commit any reversible errors.

Affirmed.