2001 WY 135

**Rick KENYON, d/b/a the First Resort, Appellant (Defendant),**

v.

**Claude ABEL, Appellee (Plaintiff).**

No. 01–8.

Supreme Court of Wyoming.

Dec. 27, 2001.

---

Barbara A. Baker, Sheridan, Wyoming, Representing Appellant. Argument by Ms. Baker.

John Fenn and Kendal R. Hoopes of Yonkee & Toner, Sheridan, Wyoming, Representing Appellee. Argument by Mr. Hoopes.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

HILL, Justice.

[¶ 1] This dispute concerns the ownership of a painting by the noted Western artist Bill Gollings. Rick Kenyon (Kenyon) purchased the painting, valued between $8,000 and $15,000, for $25 at a Salvation Army thrift store. Claude Abel (Abel) filed suit against Kenyon seeking return of the painting, which had belonged to his late aunt. Abel claimed that the Salvation Army mistakenly took the painting from his aunt's home when the box in which it was packed was mixed with items being donated to the thrift store. Kenyon appeals the district court's decision awarding the painting to Abel. We affirm.

[¶ 2] Kenyon frames the dispute in terms of five issues:

Does the Uniform Commercial Code apply to the sale of items from the Salvation Army Thrift store?

Did Defendant/Appellant Kenyon acquire title to the painting?

Was Defendant/Appellant Kenyon a good faith purchaser for value, thereby acquiring title to the painting?

Did the district court err as a matter of law by concluding that Plaintiff/Appellee Abel was entitled to possession and title to the painting even though Kenyon was a good faith purchaser for value?

Did Abel manifest donative intent?

Abel sets forth a statement of three issues:

I. Is the Trial Court's factual determination that Abel did not intend to gift an original Gollings painting supported by the evidence?

II. Without the requisite intent to gift, did title pass from Abel to the Salvation Army?

III. Can the Salvation Army convey title to a subsequent purchaser when it had no title to begin with?

In his reply brief, Kenyon presents two issues in response to Abel's arguments:

Whether the Status of Good Faith Purchaser is a Defense to a Claim for Conversion.

Whether the painting was "lost" or "stolen" for purposes of Wyoming Statute Section 34.1–2–403 of the Uniform Commercial Code.

## FACTS

[¶ 3] Abel's aunt, Rillie Taylor (Taylor), was a friend of the artist Bill Gollings, whose works were known for their accurate portrayal of the Old West. Sometime before his death in 1932, Gollings gave a painting to Taylor depicting a Native American on a white horse in the foreground with several other Native Americans on horses in the background traveling through a traditional western prairie landscape. The painting remained in Taylor's possession at her home in Sheridan until her death on August 31, 1999.

[¶ 4] After Taylor's death, Abel traveled from his home in Idaho to Sheridan for the funeral and to settle the estate. Abel was the sole heir of Taylor's estate so he inherited all of her personal belongings, including the Gollings painting. Abel and his wife sorted through Taylor's belongings selecting various items they would keep for themselves. Abel and his wife, with the help of a local moving company, packed those items into boxes marked for delivery to their home in Idaho. Items not being retained by Abel were either packed for donation to the Salvation Army or, if they had sufficient value, were taken by an antiques dealer for auction. The scene at the house was apparently one of

some confusion as Abel attempted to vacate the residence as quickly as possible while attempting to make sure all of the items went to their designated location. The painting was packed by Abel's wife in a box marked for delivery to Idaho. However, in the confusion and unbeknownst to Abel, the box containing the Gollings painting was inadvertently picked up with the donated items by the Salvation Army. The painting was priced at $25.00 for sale in the Salvation's Army Thrift Store where Kenyon purchased the painting.

[¶ 5] After returning to Idaho, Abel discovered that the box containing the painting was not among those delivered by the moving company. Through local sources, Abel learned that the painting had gone to the Salvation Army and was then purchased by Kenyon. Unsuccessful in his attempts to talk with Kenyon about the painting, Abel filed this action. Abel sought possession of the painting through two causes of action: replevin and conversion. Kenyon countered that he was a "good faith purchaser" of the painting under the Uniform Commercial Code (UCC). The district court concluded that Abel was entitled to possession of the painting under either the common law doctrines of gift or conversion or the statutory provisions of the UCC. Kenyon now appeals.

## STANDARD OF REVIEW

[¶ 6] This matter was the subject of a bench trial before the district court. "When a trial court in a bench trial makes express findings of fact and conclusions of law, we review the factual determinations under a clearly erroneous standard and the legal conclusions de novo." *Rennard v. Vollmar*, 977 P.2d 1277, 1279 (Wyo.1999) (citing *Stansbury v. Heiduck*, 961 P.2d 977, 978 (Wyo.1998) and *Springer v. Blue Cross and Blue Shield of Wyoming*, 944 P.2d 1173, 1176 (Wyo.1997)).

## DISCUSSION

*Donative Intent*

[¶ 7] The key to resolving this dispute, under either common law or the UCC, is determining whether or not the painting was voluntarily transferred from Abel to the Salvation Army. The district court concluded that Abel had no intent to give the painting to the Salvation Army. This is a factual conclusion that we will reverse only upon a showing that it is clearly erroneous. Our review convinces us that the district court's conclusion that Abel did not voluntarily transfer the painting to the Salvation Army is supported by the record and is not, therefore, clearly erroneous.

[¶ 8] Abel's testimony during the trial disclosed the following facts. Abel's aunt received the painting as a gift from the artist. Abel testified that his aunt often expressed to him the importance of the painting to her and her desire that it remain in the family's possession. He indicated that the painting had a lot of value to him and the family beyond its monetary worth because of his family's personal relationship with the artist. The aunt rejected at least one offer to buy the painting for about $5,000. After inheriting the painting, Abel's wife packed it in a box marked for delivery to their home in Idaho. On the day the painting was packed for moving, there was much confusion around the house as Abel and his wife tried to sort through all of the items and designate them for delivery to the appropriate location. In that confusion, the Salvation Army came to the house to pick up various items. The Salvation Army apparently took the painting, along with the items specifically donated to it. Abel testified that he did not intend to include the painting with the goods that were meant to go to the Salvation Army and, at that time, he had no idea that the painting had been taken by them. According to Abel, he did not learn that the painting was missing until after the moving company had delivered all of the boxes to Idaho. Upon finding that the painting was missing, Abel testified that he immediately contacted an acquaintance in Sheridan who was able to trace the painting from the Salvation Army to Kenyon. Thereupon, Abel attempted to contact Kenyon about the painting's return. Kenyon rebuffed Abel's attempts to discuss the painting thus leading to this action.

[¶ 9] The testimony of Abel is sufficient to support the district court's conclusion that

the transfer of the painting to the Salvation Army was involuntary. Abel specifically denied any intent to make such a transfer. That denial is supported by reasonable inferences that could be drawn from the painting's acknowledged sentimental value to Abel and his family and from Abel's actions in attempting to recover the painting immediately upon discovery of its loss. Under these circumstances, the district court's conclusion was not clearly erroneous.

*Common Law*

[¶ 10] The district court awarded Abel possession of the painting on the basis of two common law doctrines: the law of gifts and the law of conversion. A valid gift consists of three elements: (1) a present intention to make an immediate gift; (2) actual or constructive delivery of the gift that divests the donor of dominion and control; and (3) acceptance of the gift by the donee. *Rose v. Rose*, 849 P.2d 1321, 1324 (Wyo.1993). The pivotal element in this case is the first one: whether an intention to make a gift existed. As we noted above, we have upheld the district court's conclusion that Abel did not have any intent to donate the painting to the Salvation Army. Therefore, the district court correctly ruled that the transfer of the painting to the Salvation Army did not constitute a valid gift.

[¶ 11] Conversion occurs when a person treats another's property as their own, denying to the true owner the benefits and rights of ownership. *Ferguson v. Coronado Oil Company*, 884 P.2d 971, 975 (Wyo. 1994). To establish a conversion, a plaintiff must show:

(1) he had legal title to the converted property; (2) he either had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff his rights to use and enjoy the property; (4) in those cases where the defendant lawfully, or at least without fault, obtained posses-

sion of the property, the plaintiff made some demand for the property's return which the defendant refused; and (5) the plaintiff has suffered damage by the loss of the property.

*Ferguson*, 884 P.2d at 975 (quoting *Frost v. Eggeman*, 638 P.2d 141, 144 (Wyo.1981)). The district court held that the sale of the painting constituted conversion by the Salvation Army.[1] The record supports the district court's decision: (1) as the heir to his aunt's estate Abel had legal title to the painting; (2) Abel possessed the painting at the time it was removed from his aunt's residence; (3) the Salvation Army exercised dominion over the property in such a manner that denied Abel the right to enjoy and use the painting, *i.e.*, it sold the painting; (4) Abel demanded the return of the painting from Kenyon, who effectively refused by denying any knowledge of it; and (5) Abel has suffered damages through the loss of a valuable asset without compensation. As a good faith purchaser of converted property, Kenyon is also a converter and must answer in damages to the true owner. *Underhill Coal Mining Company v. Hixon*, 438 Pa.Super. 219, 652 A.2d 343, 345 (1994). This is true because a converter has no title whatsoever (*i.e.*, his title is void) and, therefore, nothing can be conveyed to a bona fide purchaser for value. *Underhill Coal Mining Company*, 652 A.2d at 346.

*UCC*

[¶ 12] Kenyon seeks to escape the consequences of the common law doctrines of gifts and conversion by arguing that the UCC is the applicable law in this instance. For purposes of resolving this case, we will assume that the UCC applies to the transaction between Kenyon and the Salvation Army because, as we shall see, it does not provide the benefit to Kenyon he claims it will.

[¶ 13] The district court correctly noted that a distinction exists between a "void" and a "voidable" title.

Section 2–403(1)(d) [of the UCC] provides, in effect, that a voidable title is

---

1. This is not to imply any wrongdoing on the part of the Salvation Army, which the record indicates acted entirely in good faith. A conversion is predicated on a deprivation of an owner's

right to exercise dominion over his property and not on any specific intent to commit a wrongful act. *Underhill Coal Mining Company v. Hixon*, 438 Pa.Super. 219, 652 A.2d 343, 345 (1994).

created whenever the transferor voluntarily delivers goods to a purchaser even though that delivery was procured through fraud punishable as larcenous under the criminal law. Like the other provisions of Section 2–403(1) dealing with voidable title in cases of imposture and worthless checks and cash sales, this subsection is predicated on the policy that where a transferor has voluntarily delivered the goods to purchaser, he, the transferor, ought to run the risk of the purchaser's fraud as against innocent third parties. Like the other voidable title rules of Section 2–403(1), this new rule is more easily enforced than its common-law counterpart, and also has the merits of placing the risk of fraud on the party best able to protect against it and promoting trade.

It should be noted that Section 2–403(1)(d) does not create a voidable title where the goods have been wrongfully taken, as by theft or robbery. If the goods have been stolen, the thief acquires no ownership and has no power, except in rare cases of estoppel, to pass a good title to a bona fide purchaser. Nothing in Section 2–403 changes this common-law rule. Section 2–403(1)(d) does not create a voidable title in the situation where the goods are wrongfully taken, as contrasted with delivered voluntarily because of the concepts of "delivery" and "purchaser" which are necessary preconditions. "Delivery" is defined by Section 1–201(14) "with respect to instruments, documents of title, chattel paper or securities" to mean "voluntary transfer of possession." By analogy, it should be held that goods are not delivered for purposes of Section 2–403 unless they are voluntarily transferred. Additionally, Section 2–403(1)(d) is limited by the requirement that the goods "have been delivered under a transaction of purchase." "Purchase" is defined by Section 1–201(32) to include only voluntary transactions. A thief who wrongfully takes goods is not a purchaser within the meaning of this definition, but a swindler who fraudulently induces the victim to voluntarily deliver them is a purchaser for this purpose. This distinction, reminiscent of the distinction between larceny and larceny by trick made by the common law, is a basic one for the understanding of the meaning of Section 2–403(1)(d).

1 William D. Hawkland, *Uniform Commercial Code Series* § 2–403:04 (2000) (footnotes omitted); *see also* Wyo. Stat. Ann. §§ 34.1–1–201(a)(xiv) & (xxxii) and 34.1–2–403 (Lexis/Nexis 2001). The Salvation Army, of course, did not steal the painting from Abel. However, the key here is the voluntariness of the transfer from the original owner as expressed in the definitions found at Wyo. Stat. Ann. §§ 34.1–1–201(a)(xiv) and (xxxii).

> Without attempting to specify all the situations which could give rise to a voidable title under § 2–403 of the Uniform Commercial Code, we refer to the above authorities to support our conclusion that voidable title under the Code can only arise from a voluntary transfer or delivery of the goods by the owner. If the goods are stolen **or otherwise obtained** against the will of the owner, only void title can result.

*Inmi–Etti v. Aluisi,* 63 Md.App. 293, 492 A.2d 917, 923 (1985) (emphasis added); *see also Underhill Coal Mining Company,* 652 A.2d at 346 ("[S]ince the U.C.C. gave a purchaser only that title which the seller had power to convey, and since the seller was a converter who, under the common law, had no title at all, the purchaser took nothing.").

[¶ 14] Abel did not voluntarily transfer the painting to the Salvation Army. Therefore, the Salvation Army had no title to convey to Kenyon. Kenyon attempts to avoid the consequences of this fact by arguing that he was a good faith purchaser under the UCC. However, the good faith of a purchaser is not a defense to an action for conversion under the common law or the UCC if the true owner never consented to the transfer of the goods to the person from whom the good faith purchaser bought them. *Underhill Coal Mining Company,* 652 A.2d at 346; *Inmi–Etti,* 492 A.2d at 923–24. Since no title passed from Abel to the Salvation Army, Abel is entitled to possession of the

painting.[2]

## CONCLUSION

[¶ 15] The Salvation Army did not acquire the painting in a voluntary transaction from Abel. A third party purchaser could only acquire rights in the painting to the extent of the interest possessed by the Salvation Army. Since the Salvation Army possessed a void title, the original owner was entitled to recover the painting from the third party purchaser. Accordingly, the district court's order granting possession of the painting to Abel is affirmed.

---

**2.** This should not be construed to mean that people who buy "bargains" at antique stores, flea markets or garage sales would face the prospect of having someone claiming ownership in an item seeking their return at some future time. If the sale is "voluntary" then the original owner has no claim.